798 A.2d 1155

**Daniel COLLINS**

v.

**Cynthia COLLINS.**

**No. 120, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

May 30, 2002.

396

398

400

Susan J. Rubin, Rockville, for appellant.

Dorothy R. Fait (Fait, Malament & Wise, LLP, on the brief), Rockville, for appellee.

Argued before KENNEY, ADKINS and WILLIAM W. WENNER (Ret'd, specially assigned), JJ.

KENNEY, Judge.

Lieutenant Colonel Daniel Collins ("Lt. Col. Collins") appeals a decision of the Circuit Court for Montgomery County disposing of marital property, awarding child support, and awarding attorney's fees to appellee, Cynthia Collins, Ph.D. ("Dr. Collins"). On appeal, Lt. Col. Collins poses for our consideration three questions, which we have rephrased as follows:

I. Did the trial court commit reversible error in arriving at the form and the amount of the monetary award, the pension award, and the reservation on the issue of alimony, made in favor of Dr. Collins?

II. Did the trial court commit reversible error in its child support award?

III. Did the trial court commit reversible error by awarding attorneys' fees to Dr. Collins?

For the reasons set forth below, we vacate the portion of the court's monetary award requiring Lt. Col. Collins to pay Dr. Collins $5,896.[1] We vacate the child support order and attorneys' fees award, and remand the case for further proceedings on those issues. In all other respects, we affirm the judgment of the circuit court.

———

1. The total monetary award was $15,304. This amount was based on half of the value of some diamonds that were found to be marital property, or $3,250; Dr. Collins' $6,158 marital interest in the Utah condominium purchased by Lt. Col. Collins prior to the marriage; and $5,896, which represented Dr. Collins' portion of the pension payments made to Lt. Col. Collins for the period May 1, 2000, through August 31, 2001. Although the court made an award of $15,304, the actual total for these articles is $16,404.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties were married in Utah on July 21, 1979. When they divorced, Dr. Collins was fifty-one years old and Lt. Col. Collins was forty-nine years old. Their only child, Jason Collins, was born on October 28, 1984. The family moved a number of times due to Lt. Col. Collins' Air Force career, but, at the time of the divorce, they had lived in Maryland for twelve years. Lt. Col. Collins, however, maintained his residency in the State of South Dakota, as members of the armed forces are permitted to do.[2]

In early January 2000, Lt. Col. Collins traveled from Maryland to South Dakota for a family funeral. On or about January 8, 2000, while still in South Dakota, he filed for divorce on the grounds of irreconcilable differences. During this time, Lt. Col. Collins was in the process of retiring. His retirement became effective March 31, 2000.

Lt. Col. Collins subsequently returned to the marital home in Maryland, without telling Dr. Collins that he was seeking a divorce. On January 14, 2000, Dr. Collins returned from work to find that Lt. Col. Collins had left, taking a number of belongings with him. He left notes for both Dr. Collins and Jason, but the notes did not explain why he had left or that he had filed for divorce.

On January 15, 2000, a process server arrived at the marital home and served the South Dakota divorce papers. The petition for divorce alleged, *inter alia,* that Jason was not Lt. Col. Collins' son and requested paternity testing. Jason, who was looking at the papers over Dr. Collins' shoulder, became immediately aware of these allegations. Consequently, Jason does not wish to see his father and has, throughout the proceedings below, refused visitation, even though Lt. Col. Collins apparently had a paternity test conducted and has satisfied himself that Jason is his son.

---

**2.** Lt. Col. Collins was a resident of South Dakota when he joined the Air Force.

Dr. Collins immediately retained counsel in both Maryland and South Dakota in an effort to dismiss the South Dakota case for lack of jurisdiction.[3] On February 1, 2000, Dr. Collins filed a complaint for absolute divorce in the Circuit Court for Montgomery County.

On March 21, 2000, the Circuit Court of the Second Judicial Circuit of South Dakota determined that it had jurisdiction to grant or deny the divorce, but that it lacked jurisdiction to decide issues of alimony, child support, child custody, and the division of marital property. The divorce was granted on August 7, 2000.

In the interim, the Maryland case was proceeding on the division of property, alimony, and child support and custody.[4] For a period of time, Dr. Collins was unable to serve Lt. Col. Collins, who had left no forwarding address and was apparently making himself unavailable. Eventually, she had to arrange for alternative service. He finally answered the complaint on June 7, 2000.

In her complaint, Dr. Collins requested *pendente lite* relief, including child support, child custody, and alimony. A hearing was held before a Special Master on August 8, 2000, the day

---

3. We have not been provided with a copy of the pleadings filed in South Dakota, but we assume she claimed that the trial court lacked both personal and subject matter jurisdiction in the case. We note that Dr. Collins apparently wished for the entire matter to be tried in Maryland, as she filed a complaint for absolute divorce in the Circuit Court for Montgomery County.

4. The circuit court had jurisdiction over this case by virtue of Md.Code (1984, 1999 Repl.Vol., 2000 Supp.), § 8–212 of the Family Law Article, which states:

 If an annulment or a divorce has been granted by a court in a foreign jurisdiction, a court in this State may exercise the powers under this subtitle if:
 (1) 1 of the parties was domiciled in this State when the foreign proceeding was commenced; and
 (2) the court in the other jurisdiction lacked or did not exercise personal jurisdiction over the party domiciled in this State or jurisdiction over the property at issue.

 See also FL § 11–105, allowing Maryland courts to decide issues of alimony after the grant of a divorce in another jurisdiction.

after the parties' divorce became final in South Dakota. At that hearing, Dr. Collins explained that she had obtained a Doctorate in Nursing Science during the marriage in order to increase her earning capacity. At the time of the hearing, she was earning $60,000 a year as an assistant professor at the University of Maryland in Baltimore. Although Lt. Col. Collins had received a job offer, he had not yet commenced employment. The hearing resumed on August 23, 2000, at which time the matter was taken under advisement. The master's report and recommendations were filed on October 18, 2000.

Lt. Col. Collins filed exceptions to the master's recommendations on October 30, 2000. The circuit court held a hearing on the exceptions on November 22 and December 8, 2000. It appears that the circuit court, in an oral ruling, granted some of Lt. Col. Collins' exceptions and denied others, but it never entered a written order.

A hearing on the merits of the case occurred on February 14 and 15, 2001, before a different judge. The trial court issued an oral ruling on the issues on February 15, 2001, and a written order followed on March 1, 2001. The order stated, in pertinent part:

> ORDERED that the plaintiff's TIAA/CREF [retirement account] is hereby determined to be marital property with a value of $4,971.00 and the defendant's stocks are hereby determined to be marital property with a value of $3,752.00, and no distribution shall be made between the parties with respect thereto, and it is further
>
> ORDERED that the Utah land is hereby determined to be marital property with a value of $2,000.00, and said real property shall be sold, and the net proceeds of sale divided equally between the parties, and it is further
>
> ORDERED that the three (3) loose diamonds in defendant's possession are hereby determined to be marital property with an existing value of $6,500.00, and it is further
>
> ORDERED that the Utah condominium is hereby determined to be defendant's pre-marital property; however, for reasons placed on the record, plaintiff is hereby determined to have a marital interest therein in the amount of $6,158.00, and it is further

ORDERED that the defendant's military pension is hereby determined to be marital property, and the plaintiff is hereby awarded an interest in said pension as follows:

$$\frac{\$3,685.00/\text{mo.} \times 248 \ (\# \text{ of mos. of service during marriage})}{310 \ (\# \text{ of mos. of service})} \times 50\%$$

or $1,474.00 per month, and it is further

ORDERED that the defendant is determined to owe to the plaintiff the sum of $5,896.00 as her portion of pension benefits from May 1, 2000 to and including August 31, 2001, and it is further

ORDERED that a monetary award is hereby granted in favor of the plaintiff and against the defendant in the amount of $15,304.00 as an adjustment of the equities of the parties in and to marital property, and it is further

ORDERED that a judgment is hereby entered in favor of Cynthia Collins and against Daniel Collins in the amount of $15,304.00, and it is further

ORDERED that commencing March 1, 2001, the plaintiff shall pay the monthly expense for survivor's benefits in the defendant's pension in the amount of $239.53 per month, and it is further

ORDERED that the issue of alimony is hereby reserved, to be revisited by the Court in the event the defendant is declared disabled and begins to receive disability pay[5] which affects the

---

5. Lt. Col. Collins has applied for disability benefits but has not yet received a ruling. At the hearing before the trial court on February 15, 2001, in describing his health, he testified:

> My health is as follows, I have a hearing loss from flying F4 Phantoms for about approximately six years, I have pain, headaches, stiff necks, and a trigger point over my left scapula from a car accident I had on 14 September '98 driving home from which I have received orthopaedic MRI's, chiropractic treatment, et cetera, et cetera, and so on and it still bothers me. A great deal with headaches.

monthly amount plaintiff receives from defendant's pension, and it is further

ORDERED that the defendant shall pay to the plaintiff for the support and maintenance of the minor child as child support the sum of $1,709.00 per month, commencing and accounting from March 1, 2001, and due and payable on the first day of each month in advance, and it is further

\* \* \*

ORDERED that the defendant is determined to be in arrears in his payments of child support to and including February, 2001 in the amount of $14,144.94 (which sums represents child support arrears stipulated to by the parties of $15,500.94, less $1,356.00 credited to defendant as a result of the recalculation of child support for the months of May through August, 2000), and it is further

ORDERED that a judgment is hereby entered in favor of Cynthia Collins and against Daniel Collins in the amount of $14,144.94, and it is further

\* \* \*

ORDERED that the defendant shall pay to the plaintiff as a contribution toward her attorney's fees incurred in connection with these proceedings the sum of $17,500.00, and it is further

ORDERED that a judgment is hereby entered in favor of Cynthia Collins and against Daniel Collins in the amount of $17,500.00.

---

Since that accident I have continuous ringing in the ears, I have carpal tunnel syndrome on both wrists—

\* \* \*

I have a bad knee and two flat feet. And I also have a dental problem, I have several cracked molars which the Air Force I am told by the dentist used a certain type of filling that over 10 to 12 years—

\* \* \*

I am in the process, I have had three surgeries in the last five weeks, I had a basil cell carcinoma removed from my forehead, as you can see the scar. I have had tongue surgery on the 29th of January and my tongue is still numb from that and I am still bleeding and having post nasal drip, that's why we asked for the extension.

\* \* \*

And I have had a root canal and I am having a crown put on so I have had two crowns put on in like the last six months and I have a temporary crown on right now which fell out two days ago.

This appeal followed.

## DISCUSSION

### I. Monetary Award and Pension Distribution

Appellant first argues that the trial court erred when it calculated the monetary award by including property that was non-existent at the time of the trial as well as by excluding certain property. Specifically, appellant argues that the diamonds had been sold at the time of trial, and were therefore improperly included as marital property. He also complains that the trial court failed to award Lt. Col. Collins any portion of Dr. Collin's pension account. Further, he argues that the trial court erred in the division of Lt. Col. Collin's military pension, in the award of $5,896 arising out of Lt. Col. Collin's pension payments, and by reserving on the issue of alimony. Dr. Collins, of course, contends that the trial court's rulings were correct.

### A. The Monetary Award

#### 1. Standard of Review

Maryland Rule 8–131(c) states:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

*See also Caccamise v. Caccamise,* 130 Md.App. 505, 521, 747 A.2d 221, *cert. denied,* 359 Md. 29, 753 A.2d 2 (2000) (quoting *Gallagher v. Gallagher,* 118 Md.App. 567, 580–81, 703 A.2d 850 (1997), *cert. denied,* 349 Md. 495, 709 A.2d 139 (1998)).

The standard of review governing the court's determination as to marital property is relevant here. Ordinarily, it is a question of fact as to whether all or a portion of an asset is marital or non-marital property. Findings of this type are subject to review under the clearly erroneous standard

embodied by Md. Rule 8–131(c); we will not disturb a factual finding unless it is clearly erroneous.

*Innerbichler v. Innerbichler,* 132 Md.App. 207, 229, 752 A.2d 291, *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000).

"When the trial court's findings are supported by substantial evidence, the findings are not clearly erroneous." *Innerbichler,* 132 Md.App. at 230, 752 A.2d 291. Moreover, "[t]he decision whether to grant a monetary award is generally within the sound discretion of the trial court." *Alston v. Alston,* 331 Md. 496, 504, 629 A.2d 70 (1993) (citing Md.Code (1984, 1999 Repl.Vol.), § 8–205(a) of the Family Law Article ("FL")).

### 2. Factors in Determining Amount and Payment of Award

■ When a party petitions for a monetary award, the trial court must follow a three-step procedure. First, for each disputed item of property, the court must determine whether it is marital or non-marital. FL [Family Law Article] § 8–203. Second, the court must determine the value of all marital property. FL § 8–204. Third, the court must determine if the division of marital property according to title will be unfair; if so, the court may make an award to rectify the inequity.

*Doser v. Doser,* 106 Md.App. 329, 349–50, 664 A.2d 453 (1995).

In balancing the equities, the court must consider the factors set forth in Md.Code (1984, 1999 Repl.Vol., 2000 Supp.), § 8–205(b) of the Family Law Article ("FL"):

The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both, after considering each of the following factors:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the marital property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both;

(9) the contribution by either party of property described in § 8–201(e)(3) [6] of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both.

■ "While consideration of the factors is mandatory, the trial court need not 'go through a detailed check list of the statutory factors, specifically referring to each, however beneficial such a procedure might be ... for purposes of appellate

---

**6.** FL § 8–201(e)(3) reads as follows:

(e) *Marital property.—*

\* \* \*

(3) Except as provided in paragraph (2) of this subsection, "marital property" does not include property:

 (i) acquired before the marriage;

 (ii) acquired by inheritance or gift from a third party;

 (iii) excluded by valid agreement; or

 (iv) directly traceable to any of these sources.

review.'" *Doser,* 106 Md.App. at 351, 664 A.2d 453 (quoting *Grant v. Zich,* 53 Md.App. 610, 618, 456 A.2d 75 (1983)) (other citation omitted).

■ The court granted Dr. Collins a $15,304 monetary award "as an adjustment of the equities of the parties in and to marital property." Lt. Col. Collins complains that the judge "failed to set out the basis for the monetary award that he made to" Dr. Collins. It is true that the trial court did not specifically address each of the FL § 8–205 factors. Nevertheless, it clearly took into consideration the parties' respective financial situations, "the circumstances that contributed to the estrangement of the parties," how and when various property was acquired, and the duration of the marriage, saying, in respect to the latter factor, that "an important factor to consider in this case is the length of the marriage, it's a marriage of long duration[.]" See *Bangs v. Bangs,* 59 Md.App. 350, 369–70, 475 A.2d 1214 (1984).

Other marital property exists in this case. With respect to the family use personal property, the court issued a use and possession order but stated that, when the order expired, that property "shall be sold, unless the parties are able to agree otherwise upon its disposition, and the net proceeds of sale shall be divided equally between the parties." There was also a substantial list of non-family use personal property submitted to the court, but the court reserved on the issue of distribution in the hope that the parties could come to an agreement. The court put the parties on notice that, if they could not agree, it would be sold and the proceeds equitably distributed. Indeed, Lt. Col. Collins does not complain about the court's decision to distribute the parties' marital property equitably. His complaints regarding the monetary award are quite specific, and we shall address each in turn.

### 3. The Diamonds

■ With respect to the diamonds, Lt. Col. Collins complains that the court's determination that the diamonds were marital property and were worth $6,500 "was based solely on

the Appellee's testimony that the Appellant had allegedly 'told her sometime in the past' that he had three diamonds." Dr. Collins directs us to the court's findings and argues that they speak for themselves.

Now, there is an issue about three loose diamonds. The plaintiff testified there are diamonds that were acquired during the marriage, given to her because of an interest her husband had in diamonds. It was his testimony they were the diamonds he purchased before the marriage and were non-marital property and he sold them for $1,500. It is her testimony they were, based on what he told her, worth about $6,500. I accept her testimony, the plaintiff, [and] I find that those three diamonds are marital property. They aren't available now so I will determine that to be $6,500 and award and equitably distribute it equally between the parties.

We have previously held that,

[a]s a general rule, property disposed of before trial cannot be marital property. *Gravenstine v. Gravenstine,* 58 Md. App. 158, 177, 472 A.2d 1001 (1984). An exception to this rule is where one spouse claims that the property was improperly dissipated by the other spouse. *See Rock v. Rock,* 86 Md.App. 598, 618–20,. 587 A.2d 1133 (1991). Once improper dissipation is alleged, the burden shifts to the spouse claiming that dissipation occurred to prove that the other spouse used the marital property during the marriage to prevent inclusion of the assets for any consideration of a monetary award.

*Choate v. Choate,* 97 Md.App. 347, 366, 629 A.2d 1304 (1993). *See also Beck v. Beck,* 112 Md.App. 197, 216, 684 A.2d 878 (1996), *cert. denied,* 344 Md. 717, 690 A.2d 523 (1997).

Dr. Collins argued that the diamonds were dissipated. Lt. Col. Collins has maintained that he sold the diamonds because he needed the money to help pay bills.

Dr. Collins has claimed throughout that Lt. Col. Collins voluntarily impoverished himself and had the ability to pay additional support but has not done so, apparently equating

improper dissipation with voluntary impoverishment. Lt. Col. Collins points out that the court, in the December 8, 2000 exceptions hearing, found no voluntary impoverishment. This finding, however, was directly related to the issue of whether Lt. Col. Collins was diligent in his efforts to locate post-retirement employment. Moreover, no witnesses were called at the hearing on the exceptions, which concerned only the *pendente lite* child support, child custody, and alimony awards.

■■ We have never required a trial court to make a specific finding of dissipation. *See Welsh v. Welsh,* 135 Md.App. 29, 52, 761 A.2d 949 (2000), *cert. denied,* 363 Md. 207, 768 A.2d 55 (2001) (inferring a finding of dissipation from the trial court's ruling). We infer a similar finding of dissipation in the trial court's ruling here.

Clearly, the trial court credited Dr. Collins' testimony that the diamonds were purchased during the marriage and that they were worth $6,500. Lt. Col. Collins argues that testimony that the diamonds had a value of $1,500 was "uncontroverted" and was "the only credible evidence of the value of the diamonds." Lt. Col. Collins never provided the court with an appraisal of the diamonds, a receipt for the diamonds' sale, or identified to whom he sold the diamonds. Acknowledging that the diamonds were unavailable, the trial court accepted Dr. Collins' valuation, which, according to her, was the value ascribed to them by Lt. Col. Collins. As stated above, we will not find clear error in a ruling based on a credibility determination. Rule 8–131(c); *Caccamise,* 130 Md.App. at 521, 747 A.2d 221.

At oral argument, Lt. Col. Collins contended that the court was required to determine the "present value" of the diamonds, which he contends to be $1,500. We decline to reduce the monetary award to $750 to reflect the price for which Lt. Col. Collins allegedly sold the diamonds. Even assuming that Lt. Col. Collins sold the diamonds for $1,500, absent some evidence of an arm's length sale, there is no proof that this was the actual value of the diamonds. The court's conclusion was not clearly erroneous.

#### 4. Dr. Collins' TIAA–CREF Account

 Lt. Col. Collins next contends that the court erred by failing to award him half of the value of Dr. Collins' TIAA–CREF account, or, alternatively, by not allowing him to take a credit against the monetary judgment. Again, Dr. Collins argues that the trial court's findings and ruling speak for themselves.

The trial court made the following finding with respect to this account:

> Then with regard to the TIA[A]-Cref account of the plaintiff's, I will accept the suggestion of the plaintiff that even though that is marital property, so was [sic] the stocks that Mr. Collins had possession of and has dissipated before the trial, they were marital property and dissipated so I will just treat that as a wash even though there is a slight difference in value, it's not enough to worry about. So she will be able to keep that Cref account intact because of the settlement.

The trial court clearly found that Lt. Col. Collins had dissipated certain "stocks" during the separation period. Consequently, we find no abuse of discretion in the court's decision not to award Lt. Col. Collins a portion of the TIAA–CREF account, but instead using his marital interest in it to offset the value of assets that he dissipated.

#### 5. Monetary Award Based on Pension Payments

 We shall discuss other aspects of Lt. Col. Collins' many complaints concerning the distribution of his pension in Section I.B of this opinion. We address here his complaint concerning the sum of $5,896 included in the monetary award to Dr. Collins, based on pension payments he received prior to the divorce. He argues that this sum arose "solely out of the retirement pay received by the Appellant *prior* to the divorce between the Parties[.]" (Emphasis in appellant's brief.) Because the pension payments were made prior to the time of the divorce, he argues that they could no longer be considered marital property. Dr. Collins argues that the pension award

was proper because, as the court stated, " 'the Plaintiff has not received any portion of her marital share' for the months of May thru August, 2000."

The court explained its ruling as follows:

Now, insofar as marital, the military pension, the defendant has retired and is receiving from the military $3,685 a month and he began receiving this military pension in May of 2000 and to this date, the plaintiff has not received any portion of her marital share.

And her marital share is equivalent to 40 percent of the pension based on the number of months the parties were married while the defendant was earning his pension to the date of his separation from the military and so I am considering the numerator to be 248 months and the denominator 311 months, 80 percent roughly divided by half equals 40 percent. It comes out to $1,474 a month effective May 1, 2000.

There is no question that a pension, or rights to a pension, are part of marital property. FL § 8–204(b); *Lookingbill v. Lookingbill*, 301 Md. 283, 289, 483 A.2d 1 (1984); *Deering v. Deering*, 292 Md. 115, 130–31, 437 A.2d 883 (1981); *Long v. Long*, 129 Md.App. 554, 574, 743 A.2d 281 (2000).

Three methods of determining the value of a pension have been developed because most often the pension at issue has not vested as of the date of divorce. *See Deering*, 292 Md. at 130–31, 437 A.2d 883 (explaining the different methods of placing a value on a pension); *Kelly v. Kelly*, 118 Md.App. 463, 471, 702 A.2d 999 (1997) (noting that the true value of a pension often cannot be ascertained with any certainty at the time of divorce).

In this case, the pension had vested and present value was readily ascertainable.[7] The court used the *Bangs* formula to determine Dr. Collins' marital portion of Lt. Col. Collin's monthly pension of $3,685. The division was to be fifty-fifty

---

7. We recognize that Lt. Col. Collins may be awarded disability pay, but the present value was correct at the time the trial court ruled.

for pension benefits accruing during the marriage, as expressed in the following formula:

$$\frac{1}{2} \times \frac{(248 \text{ months of marriage})}{(310 \text{ months of service})} \times \$3,685$$

Lt. Col. Collins was already in the Air Force when he married Dr. Collins. Therefore, her share would be 50% of the portion earned while the two were married, rather than 50% of the entire pension. Lt. Col. Collins does not allege, nor do we perceive, any abuse of discretion in the trial court's determination that Dr. Collins was entitled to 50% of the marital portion of the pension.

Lt. Col. Collins complains that the trial court could not require him to pay to Dr. Collins a share of pension benefits he received for the four months during which they were separated but not divorced. This is because, although the rights to a pension are considered marital property, "property disposed of before trial cannot be marital property." *Choate*, 97 Md.App. at 366, 629 A.2d 1304.

FL § 8–205 permits a monetary award "as an adjustment of the equities and rights of the parties **concerning marital property**[.]" (Emphasis supplied.) Although the court may consider any fact "necessary or appropriate" in arriving at a "fair and equitable" monetary award, the award relates back to marital property. In *Gravenstine v. Gravenstine*, 58 Md. App. 158, 177, 472 A.2d 1001 (1984), we said that

marital property which generates a monetary award must ordinarily exist as "marital property" as of the date of the final decree of divorce based on evidence adduced at the trial on the merits or a continuation thereof. Therefore, property disposed of before commencement of the trial under most circumstances cannot be marital property.

The pension payments at issue were made prior to the divorce and had been expended as of the date of the divorce.

As observed earlier, an exception to the rule in *Gravenstine* is where one spouse claims that the property was "improperly dissipated by the other spouse." *Choate*, 97

Md.App. at 366, 629 A.2d 1304 (citing *Rock v. Rock,* 86 Md.App. 598, 618–20, 587 A.2d 1133 (1991)). "Dissipation may be found where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage at a time where the marriage is undergoing an irreconcilable breakdown." *Jeffcoat v. Jeffcoat,* 102 Md.App. 301, 308, 649 A.2d 1137 (1994) (quoting *Sharp v. Sharp,* 58 Md.App. 386, 401, 473 A.2d 499 (1984) (citing *Klingberg v. Klingberg,* 68 Ill.App.3d 513, 25 Ill.Dec. 246, 386 N.E.2d 517, 521 (1979))).

■ The party alleging dissipation has the initial burden of showing dissipation has taken place. *Welsh v. Welsh,* 135 Md.App. 29, 50, 761 A.2d 949 (2000). Once the *prima facie* case of dissipation is proven, the burden shifts to the other party to show that the assets were expended appropriately. The court must then determine, either implicitly or explicitly, whether the joint funds were dissipated. *Welsh,* 135 Md.App. at 50–51, 761 A.2d 949.

Here, the court only expressed concern that Dr. Collins had not received any portion of the paid pension benefits. Even if we deemed that fact adequate to establish a *prima facie* case of dissipation, the evidence before the court was that Lt. Col. Collins' sole income during this period came from his retirement pay and that, at least, some monies were paid toward child support during this period. As he was in the process of retiring before the initiation of any divorce proceedings, there would be no reason to believe that his retirement was simply an attempt to reduce any equitable distribution award. Moreover, in consideration of the support issues, there was no finding that Lt. Col. Collins should have had a job or was otherwise voluntarily impoverishing himself during this period. Unlike the court's discussion regarding the diamonds and the stock, there is neither an express finding nor a clear basis for an implied finding that the pension funds were dissipated so as to entitle Dr. Collins to reimbursement as part of an adjustment of the equities between the parties. *See Welsh,* 135 Md.App. at 50–51, 761 A.2d 949. Therefore, we will vacate this portion of the trial court's monetary award and remand

for further proceedings on the issue of dissipation of these funds.

### B. Pension Award and Reservation of Alimony

Lt. Col. Collins argues that the formula the court used in making the pension award was erroneous and that the constituted pension order was improper. He also argues that the trial court erred by reserving on the issue of alimony.

#### 1. Dr. Collins' Marital Share of the Pension

Lt. Col. Collins contends that federal law, which governs his military pension, prohibits the court from assessing a marital award for the period between July 21, 1979, the day of the marriage, and June 25, 1981, the date set forth in the Uniform Services Former Spouses' Protection Act ("USFSPA"), 10 U.S.C. § 1480(c) (2000).[8] Dr. Collins argues that, because the "instant case was filed after 1982, thus [she] has the full benefit of all USFSPA protections." The court made no specific findings as to this issue.

The pertinent provision of the USFSPA reads as follows:

(c) *Authority for court to treat retired pay as property of the member and spouse.*

(1) Subject to the limitations of this section, a court may treat disposable retired pay [9] payable to a member for pay

---

8. Unless otherwise indicated, all citations to Title 10 will be to the version in force in 2000, at the time Lt. Col. Collins instituted divorce proceedings.

9. "Disposable retired pay"
means the total monthly retired pay to which a member is entitled less amounts which—
(A) are owed by that member to the United States for previous overpayments of retired pay and for recoupments required by law resulting from entitlement to retired pay;
(B) are deducted from the retired pay of such member as a result of forfeitures of retired pay ordered by a court-martial or as a result of a waiver of retired pay required by law in order to receive compensation under title 5 or title 38;
(C) in the case of a member entitled to retired pay under chapter 61 of this title [10 U.S.C. §§ 1201 *et seq.*], are equal to the amount of

periods beginning after June 25, 1981, either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court. A court may not treat retired pay as property in any proceeding to divide or partition any amount of retired pay of a member as the property of the member and the member's spouse or former spouse if a final decree of divorce, dissolution, annulment, or legal separation (including a court ordered, ratified, or approved property settlement incident to such decree) affecting the member and the member's spouse or former spouse (A) was issued before June 25, 1981, and (B) did not treat (or reserve jurisdiction to treat) any amount of retired pay of the member as property of the member and the member's spouse or former spouse.

10 U.S.C. § 1408(c)(1).

■■■ The Court of Appeals "has stated many times 'that the cardinal rule of statutory construction is to ascertain and effectuate legislative intention.'" *State v. Green,* 367 Md. 61, 81, 785 A.2d 1275 (2001) (citations omitted). When we interpret a statute, our starting point is always the text of the statute. *Adamson v. Correctional Medical Services, Inc.,* 359 Md. 238, 251, 753 A.2d 501 (2000). "[I]f the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end." *Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001). The plain meaning rule, however, is "elastic, rather than cast in stone[,]" and if "persuasive evi-

---

retired pay of the member under that chapter computed using the percentage of the member's disability on the date when the member was retired (or the date on which the member's name was placed on the temporary disability retired list); or

(D) are deducted because of an election under chapter 73 of this title [10 U.S.C. §§ 1431 *et seq.*] to provide an annuity to a spouse or former spouse to whom payment of a portion of such member's retired pay is being made pursuant to a court order under this section.

10 U.S.C. § 1408(a)(4).

dence exists outside the plain text of the statute, we do not turn a blind eye to it." *Adamson*, 359 Md. at 251, 753 A.2d 501 (citing *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 513–14, 525 A.2d 628 (1987)).

"[I]n determining a statute's meaning, courts may consider the context in which a statute appears, including related statutes and legislative history." *Ridge Heating, Air Conditioning & Plumbing v. Brennen*, 366 Md. 336, 350–51, 783 A.2d 691 (2001). "We may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore v. Dep't of Employment and Training*, 309 Md. 28, 40, 522 A.2d 382 (1987). "This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense." *Adamson*, 359 Md. at 252, 753 A.2d 501.

Lt. Col. Collins contends that the plain language of 10 U.S.C. § 1408(c) provides that any "disposable retired pay" accrued from pay periods before June 25, 1981, may not be treated as marital property. The plain language of the statute is that "a court may treat disposable retired pay payable to a member for pay periods beginning after June 25, 1981," as marital property in accordance with applicable state law. There is no question that Lt. Col. Collins' pension became "payable" after that date. The Court of Appeals has previously recognized, albeit in *dicta*, the legislative history of the statute makes clear that disposable retired pay benefits accrued prior to June 25, 1981, can be distributed pursuant to the USFSPA. The Court addressed 10 U.S.C. § 1408(c) in *Andresen v. Andresen*, 317 Md. 380, 564 A.2d 399 (1989).

The Andresens had been divorced on November 13, 1981, after forty years of marriage. Earlier that year, on June 26, 1981, the U.S. Supreme Court held in *McCarty v. McCarty*, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), that military retirement pay was not marital property and so was not divisible upon divorce. The Court of Appeals had applied *McCarty* in *Hill v. Hill*, 291 Md. 615, 621, 436 A.2d 67 (1981).

The trial court in *Andresen*, following *Hill*, did not award any portion of the husband's military pension to Mrs. Andresen.

Thereafter, Congress enacted the USFSPA "on September 8, 1982, codified in pertinent part at 10 U.S.C. § 1408(c)(1), effective February 1, 1983." *Andresen*, 317 Md. at 383, 564 A.2d 399. Mrs. Andresen sought to reopen her divorce on March 12, 1986, in light of the USFSPA. Although the Court of Appeals ultimately decided that there was no procedural mechanism in Maryland allowing her to reopen the case, *Id.*, at 391, 564 A.2d 399, it reviewed the legislative history behind the USFSPA.

The Senate Report made the purpose of the Act clear:

The purpose of this [Act] is to place the courts in the same position they were in on June 26, 1981, the date of the *McCarty* decision, with respect to treatment of nondisability military retired or retainer pay. The [Act] is intended to remove the federal preemption found to exist by the United States Supreme Court and permit State and other courts of competent jurisdiction to apply pertinent state or other laws in determining whether military retired or retainer pay should be divisible. Nothing in this [Act] requires any division; it leaves that issue up to the courts applying community property, equitable distribution or other principles of marital property determination and distribution. Senate Report No. 97–502, July 22, 1982, reprinted in 1982 *U.S.Code Cong. & Admin. News*, 1555, 1596, 1611.

*Andresen*, 317 Md. at 383–84, 564 A.2d 399. *See also Evans v. Evans*, 75 Md.App. 364, 368, 541 A.2d 648 (1988) (quoting Senator Jeremiah Denton from the same Senate Report at 1626 as saying: "Those wives who have loved and served as wives and mothers for many years deserve more than mere recognition. They are entitled to a degree of security.").

■ Prior to June 26, 1981, when the Supreme Court decided that military retirement or retainer pay was not divisible marital property, the decision had been left to state law. Military pensions were considered to be divisible marital property in certain states. *See McCarty*, 453 U.S. at 218, 101

S.Ct. 2728 (reviewing a ruling by California state courts finding that the military pension was "subject to division as quasi-community property."); *Hill*, 291 Md. at 621 n. 4, 436 A.2d 67 (citing *In re Marriage of Miller*, 187 Mont. 286, 609 P.2d 1185 (1980), *vacated and remanded, Miller v. Miller*, 453 U.S. 918, 101 S.Ct. 3152, 69 L.Ed.2d 1000 (1981) (noting that Montana, an equal distribution state, found the military pension to be divisible marital property.)). *See also* 1982 *U.S.Code Cong. & Admin. News* at 1602 ("The committee notes that until June 26, 1981, a number of state courts traditionally recognized that military retired pay could be dealt with as marital property and divided between the parties."). Because the purpose of the USFSPA was to "place the courts in the same position they were in on June 26, 1981," the date's relevance is to ensure continuity with the pre-June 26, 1981, law for the period between June 26, 1981, and the passage of the USFSPA. Congress specifically overruled the Supreme Court with the intent to return to state law. "[U]nder Maryland law, as construed in *Deering v. Deering, supra*, pensions generally, including military pensions, are marital property." *Andresen*, 317 Md. at 384, 564 A.2d 399.

As the Court of Appeals explained,

the legislative history [of the USFSPA] reveals that Congress contemplated that divorce decrees, entered between the date of the *McCarty* decision and the effective date of the USFSPA, might be reopened. The previously quoted report of the Senate Committee on Armed Services stated (Senate Report No. 97–502, *supra*, 1599–1600):

"Former spouses divorced in the interim period between the *McCarty* decision and the effective date of this law will have an opportunity to return to court to have their decrees modified in light of this legislation."

And later, the report explains (*id.* at 1611):

This power is returned to the courts retroactive to June 26, 1981. This retroactive application will at least afford individuals who were divorced (or had decrees modified) during the interim period between June 26, 1981 and the

effective date of this legislation the opportunity to return to the courts to take advantage of this provision.

*Andresen,* 317 Md. at 384–85, 564 A.2d 399.

Accordingly, the Senate specifically contemplated the revision of decrees that had been entered or modified during the period between the date of the *McCarty* decision and the effective date of the USFSPA.[10] If the language of the statute referring to "treat[ing] disposable retired pay payable to a member for pay periods beginning after June 25, 1981," were construed without reference to the legislative history, part of the purpose of the statute, to fix the inequities caused by the *McCarty* decision, would be defeated.

As recognized by the California Court of Appeals, First Appellate District, the USFSPA "contained no provisions relating to the division of military retirement pay which became

---

**10.** Other state courts have come to similar conclusions concerning the effect of the USFSPA and have applied state law to the distribution of marital property in cases involving disposable retired pay accrued before June 25, 1981. *See, e.g., Steczo v. Steczo,* 135 Ariz. 199, 659 P.2d 1344, 1346 (Ct.App.1983) ("It is clear, however, that the effect of the Act is to allow this court to apply Arizona community property law regarding the divisibility of military pensions as it existed on June 26, 1981, to all cases pending in the trial court and on appeal."); *In re Marriage of Buikema,* 139 Cal.App.3d 689, 691, 188 Cal.Rptr. 856 (1983) ("California law treating military retirement pensions as community property is no longer preempted. The act's legislative history clearly indicates Congress' intent to abrogate all applications of the *McCarty* decision[.]"); *Allen v. Allen,* 484 So.2d 269, 270 (La.Ct.App. 1986), *cert. denied,* 488 So.2d 199 (1986) ("The Act was thus given effect retroactive to the date of the aforementioned Supreme Court decision, a date before which our courts recognized that military retirement pay must be classified as community property when acquired during the community."); *Neese v. Neese,* 669 S.W.2d 388, 390 (Tex.Ct.App.1984) (requiring husband to pay wife for amounts of military pension benefits she was not paid during the pendency of the *McCarty* decision and noting that "the apparent purpose of the 'June 25, 1981' date in Section 1408(c)(1) is to place the courts in the same position that they were in on June 26, 1981, when *McCarty* was decided."); and *In re Marriage of Smith,* 100 Wash.2d 319, 669 P.2d 448, 451 (1983) ("As we are no longer bound by the *McCarty* decision, we now hold, in accordance with section 1408(c)(1) of the new Act, a court may award up to 50 percent of the disposable retired or retainer pay to the nonmilitary spouse, provided all requirements of the Act are met.").

payable prior to June 25, 1981." *In re Marriage of Curtis,* 7 Cal.App.4th 1, 14, 9 Cal.Rptr.2d 145 (1992). Based on the history of the statutory provision, the court stated "that benefits which had become payable prior to the enactment of [the USFSPA], would also be divided in accordance with state law principles (because *McCarty* would not be applied retroactively)." *Id.* Courts addressing this issue, but not applying *McCarty* retroactively, have declined to apply the decision retroactively because of the *res judicata* effect of final divorce decrees as well as the fact that the Supreme Court provided no indication in *McCarty* that it intended a retroactive application.[11] *See Armstrong v. Armstrong,* 696 F.2d 1237, 1238 (9th Cir.), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983); *Erspan v. Badgett,* 659 F.2d 26, 28 (5th Cir.1981); *Erbe v. Eady,* 406 So.2d 936, 938–39 (Ala.Civ.App.), *cert. denied,* 406 So.2d 939 (Ala.1981); *Rodriguez v. Rodriguez,* 133 Ariz. 88, 649 P.2d 291, 291 (Ct.App.1982), *approved,* 133 Ariz. 87, 649 P.2d 290 (1982); *Burt v. Smith,* No. CA84–26, 1984 WL 6558, at *1, 1984 Ark.App. LEXIS 1823 at *3 (Ark.Ct. App. Oct. 24, 1984); *Allcock v. Allcock,* 107 Ill.App.3d 150, 62 Ill.Dec. 865, 437 N.E.2d 392, 396 (1982); *Tarver v. Tarver,* 441 So.2d 451, 452 (La.Ct.App.1983), *cert. denied,* 445 So.2d 1232 (La.1984); *Chisnell v. Chisnell,* 149 Mich.App. 224, 385 N.W.2d 758, 760 (1986); *Duke v. Duke,* 98 Nev. 148, 643 P.2d 1205, 1206 (1982); *Stroshine v. Stroshine,* 98 N.M. 742, 652 P.2d 1193, 1195 (1982); *In re Marriage of Vinson,* 57 Or.App. 355, 644 P.2d 635, 636 (1982); *Bachelder v. Moore,* 288 S.C. 405, 343 S.E.2d 32, 33 (App.1986); *Segrest v. Segrest,* 649 S.W.2d 610, 612 (Tex.1983); and *In re Marriage of Brown,* 98 Wash.2d 46, 653 P.2d 602, 605 (Wash.1982).

---

**11.** Some states did apply *McCarty* in cases in which appeals from a judgment of divorce were pending. *See Rice v. Rice,* 103 Idaho 85, 645 P.2d 319, 321 (1982) (noting that, because the case was pending appeal at the time of *McCarty,* application of that case was "not correctly denominated as a retroactive application"); and *In re Marriage of Vinson,* 57 Or.App. 355, 644 P.2d 635, 636, *petition denied,* 293 Or. 456, 650 P.2d 928 (1982) (recognizing that *McCarty* had been applied to judgments on appeal but refusing retroactive application to final and unappealable judgments).

Accordingly, we hold that the portion of Lt. Col. Collin's retirement pay available for distribution was not limited to the portion accruing after June 26, 1981.

### 2. The Constituted Pension Order

▆ Lt. Col. Collins' arguments as to why the constituted pension order ("CPO") was improper became more clear at oral argument.[12] Based on the assumption that the CPO would remain valid in the event Lt. Col. Collins is entitled to and awarded disability pay, his problem with the CPO is two-fold. First, he contends that the CPO awarded Dr. Collins more than 50% of his disposable retired pay, because the CPO speaks in terms of a specific dollar amount, rather than a percentage. Second, he complains about the following language:

ORDERED, that the Member is specifically directed, under the penalty of contempt to pay the Spouse her interest in his retired pay as herein provided. The Member is not relieved of this obligation except that he is notified that the full interest of the Spouse has been paid directly to her by the Defense Finance Center; and it is further,

\* \* \*

ORDERED, that if the payment of benefits to the Spouse from the transferred interest of the Member does not begin at the time specified herein, or if the payments of the Spouse cease or are suspended for any length of time, or if such payments are less than the amount specified herein, or if the Member shall waive entitlement to receive any part of all of his military pension entitlement for any reason, the Member shall pay to the spouse an amount equal to the amount that the Spouse would have received from the Service Finance Center had the Center paid those amounts

---

12. To the extent that this argument relies on Lt. Col. Collins' interpretation of 10 U.S.C. § 1408(c), and he is excluding the twenty-three month period between July 21, 1979 and June 25, 1981, from the calculation of the marital share of the pension, he is incorrect for the reasons stated above.

as required hereby. Any such payment or payments by the Member shall be made within thirty (30) days after the date on which each such payment would have been paid b[y] the Center in accordance with this Order[.]

Dr. Collins argues that it is proper to express an award using a dollar amount. She points out that the court drafted the CPO with the notion that it might be abrogated if Lt. Col. Collins gets disability pay. At oral argument, appellee's attorney appeared to assume that a new CPO would be entered in that event.

The court expressly retained jurisdiction to modify the order:

ORDERED, that the following facts are found:

* * *

8. That this Court should retain jurisdiction to modify this Order as necessary; and it is further

* * *

ORDERED, that this Order shall be interpreted in light of the Uniformed Services Former Spouses' Protection Act ("Act") codified at 10 U.S.C. § 1408, as amended, and is subject to modification, should it become necessary to conform this Order to the requirements of the Act or the implementing regulations[.]

The constituted pension order does not award Dr. Collins more than 50% of Lt. Col. Collin's **current** disposable retired pay. The award is clearly for 40% of his monthly pension payment even though it is expressed in terms of a dollar amount. This is entirely proper pursuant to 10 U.S.C. § 1408(a)(C).[13]

---

13. That provision states that, "in the case of a division of property, [the order] specifically provides for the payment of an amount, **expressed in dollars or as a percentage of disposable retired pay,** from the disposable retired pay of a member to the spouse or former spouse of that member." 10 U.S.C. § 1408(a)(2)(C) (emphasis supplied).

This specified dollar amount, however, would be incorrect if and when Lt. Col. Collins is awarded disability pay, because disability payments are not divisible marital property. *Evans,* 75 Md.App. at 369, 541 A.2d 648. Lt. Col. Collins argues that, as currently worded, the CPO would require him to pay the difference between the $1,474 monthly award set forth and his disposable retired pay taking disability into account. If he does not pay her, he would be subject to contempt proceedings under the CPO.

It is clear that the court recognized the potential of a disability award and the need to enter a new CPO in the event of a disability award. Under the circumstances of this case, because it would preclude the need for a new CPO, it would have been preferable to express the monthly award as a percentage rather than a dollar amount. On the other hand, the CPO provides:

> ORDERED, that it is this Court's intent to provide the Spouse with the share of the Member's retirement benefits that fairly represent her marital share of said retirement benefits. If this Order is determined not to accomplish this intent, or, for whatever reason, is not accepted by the Service Finance Center (or by such other successor agency or entity which shall review this Order), any necessary modification Order shall be entered *nunc pro tunc* [.]

Under the circumstances, Lt. Col. Collins should not be held either personally liable or in contempt for any difference in payments should he receive a disability award. Because we are remanding this case for other reasons, we believe that it would be appropriate to enter an amended CPO with the award expressed in terms of the percentage of disposable retired pay to forestall any problems that might occur as a result of a disability award.

### 3. Reservation of the Issue of Alimony

Coupled with Lt. Col. Collins' arguments concerning the CPO is his complaint that the trial court improperly reserved the issue of alimony. Dr. Collins argues that the

reservation of this issue is entirely proper, because her award will be reduced if Lt. Col. Collins is awarded disability pay.

The trial court's reasoning for its ruling was as follows:

Now, there is another issue in this case and that issue is raised by the defendant that he has applied for disability payment because of a disability that occurred while he was in the military service and if he is successful in being determined to be disabled, it will affect his military pension and if that occurs, that portion would not be, whatever he gets would not be marital property and would affect what the plaintiff receives. That is a non-issue I should say as far as I am concerned because it hasn't happened yet and I can't really deal with it. I can only deal with what the evidence is here.

But in the event that into the future the defendant is determined to be disabled, then at today's time, I am reserving the issue of alimony because in the event he is disabled and it affects the money that is paid on a regular basis because of the pension Mrs. Collins is receiving, it would be appropriate to re-visit the issue of alimony at that time. So for that reason, I am reserving on that issue. At the present time, Mrs. Collins is self-supporting and is not in need of alimony but depending on what the future brings, it may have to be re-visited. So I will reserve on alimony.

Dr. Collins cites *Turrisi v. Sanzaro*, 308 Md. 515, 520 A.2d 1080 (1987), in support of her contention that the court's reservation was proper. In that case, the parties had been able to resolve the bulk of the issues in their divorce by agreement. Both parties were medical doctors, but during the marriage, Dr. Sanzaro was diagnosed with multiple sclerosis. She wished to remain self-supporting, and the chancellor found that she declined alimony at the time of the divorce. "On the authority of *Quigley v. Quigley*, 54 Md.App. 45, 456 A.2d 1305 (1983), [the chancellor] held he had no power to reserve the question of future alimony." *Turrisi*, 308 Md. at 519, 520 A.2d 1080. This Court agreed with the chancellor,

although we remanded the case for further inquiry into other factors that might be relevant to an alimony award.

The Court of Appeals, in reversing that decision, traced the history of Maryland equity courts' treatment of alimony. It was "common practice for the equity courts to reserve jurisdiction over alimony, even though none was awarded at the time of the divorce." *Turrisi,* 308 Md. at 522, 520 A.2d 1080. The Alimony Act was eventually passed and is now codified at Title 11 of the Family Law Article. The Court then looked to the Act to determine whether it abrogated the equity courts' "inherent power to award alimony, and inherent power to reserve as to alimony." As part of its review, the Court of Appeals also looked at the 1980 Report of the Governor's Commission on Domestic Relations Law ("1980 Report"), in which the Alimony Act was proposed. *Turrisi,* 308 Md. at 526, 520 A.2d 1080.

The Commission recognized the existence of the inherent power of the equity courts to reserve on the issue of alimony, and it observed " 'when a Court enters a decree of divorce; it may also award alimony or **reserve the right to do** so[.]' " *Turrisi,* 308 Md. at 527, 520 A.2d 1080 (quoting 1980 Report at 1) (emphasis supplied). Neither the Report nor the legislation made any further reference to reservation of alimony. The Court stated that

> [t]o ask us to assume that by mere silence the legislature intended to abolish a long-standing inherent power of Maryland equity courts, specifically called to its attention by the Commission, is to ask too much. Repeal of such a power by silence is not favored, *see Hoffman v. Key Federal Sav. and Loan Ass'n,* 286 Md. 28, 43, 416 A.2d 1265, 1269 (1979), and we shall not indulge any such assumption here. Nor do we believe that the legislative intent demonstrated by the purposes of the Alimony Act, *see McAlear[ v. McAlear,* 298 Md. 320, 343 n. 23, 469 A.2d 1256 (1984) ], requires us to hold that the power to reserve alimony has been abrogated....

For example, facts before a court may demonstrate no present basis for either rehabilitative or indefinite alimony.

But those same facts may show that a highly probable basis for awarding one or the other will exist in the immediate future. Under such circumstances, we see no reason why reservation would be inconsistent with the purposes of the Act. Indeed, under such circumstances, reservation would be consistent with the Act's overall purpose, as we defined it in *McAlear*, 298 Md. at 348, 469 A.2d at 1271: "The purpose of the 1980 Alimony Act is to provide for an appropriate degree of spousal support in the form of alimony after the dissolution of the marriage."

We hold, therefore, that the Alimony Act has not abolished the inherent power of an equity court to reserve jurisdiction as to alimony when it awards a divorce.

*Turrisi*, 308 Md. at 527–28, 520 A.2d 1080.

The Court cautioned, however, that the power to reserve was within the discretion of the trial court and should not be exercised in every case. Whether a court should "exercise [its] discretion in favor of reservation is a matter affected by various considerations, non-statutory as well as statutory." *Turrisi*, 308 Md. at 528, 520 A.2d 1080. There must be more than a "vague future expectation of circumstances that might show a basis for alimony" or the mere possibility that, at some "unknown future date," "a claimant might become aged, infirm, or disabled, or that standards of living could conceivably be unconscionably disparate[.]" *Id.* at 529, 520 A.2d 1080. The Court of Appeals also cautioned that reservation of alimony in cases where a monetary award has been made requires "the most careful exercise of discretion." *Id.*, at 529, 520 A.2d 1080.

This court has reviewed the issue of reservation of alimony in a recent case. *Durkee v. Durkee*, 144 Md.App. 161, 797 A.2d 94 (2002). Although the parties were not privy to this case law at the time of oral argument, it deserves discussion. In *Durkee*, the husband had been laid off as the result of a reduction in force and elected to start his own business. This was apparently not a serious venture, however, as he spent little time on the business and earned little income after he

lost his job. The parties separated and eventually divorced. "Although the [circuit] court did not expressly find that appellant had deliberately attempted to impoverish himself so as to dodge the payment of alimony, the evidence demonstrated that appellant's efforts regarding his business venture were hardly serious." *Durkee,* 144 Md.App. at 178, 797 A.2d 94.

The wife, who seemed to recognize that husband was unable to pay her alimony in light of his financial situation, requested the reservation of alimony. The trial court, apparently recognizing that, if it declined to award any alimony and failed to reserve on the issue, husband could walk out of the court-house, obtain a good-paying job and be relieved from alimony entirely, elected to reserve. After discussing *Turrisi* at some length, Judge Hollander, writing for this Court, concluded that

the circuit court was not entitled to reserve as to alimony based on a wait-and-see approach. Given the evidence presented, the question of when, if at all, [husband's] business would prove economically successful fell within the category of "vague future expectation of circumstances," which *Turrisi* rejected as a ground for reservation.

*Durkee,* 144 Md.App. at 179–80, 797 A.2d 94.

Lt. Col. Collins argues that, unlike the situation in *Turrisi,* there is too much uncertainty in this case and that the court's reservation was an abuse of discretion. Had he had the benefit of *Durkee,* he would presumably argue that his case is more like *Durkee* than *Turrisi.* He also points out that reservation was inappropriate in light of the court's finding that Dr. Collins was self-supporting. We are not persuaded. Lt. Col. Collins applied for disability payments "[w]ithin I think two to three weeks after getting out of—so it would be mid-April, the soonest I could get in and get an appointment with them," and he "absolutely" believes he is entitled to disability pay. The Department of Veteran's Affairs acknowledged his application on May 23, 2000, although it also advised that there was a delay in processing the application.

Accordingly, Lt. Col. Collins's application is currently pending before the appropriate agency, and the trial court appar-

ently believed it had a likelihood of success. The very real possibility that Lt. Col. Collins would be granted some amount of disability pay is not the uncertain, nebulous, or possible occurrence impugned by the *Turrisi* court and found in *Durkee.* The application has been filed and the process is underway. Even though the precise outcome is unknown, the discrete nature of the process itself removes the disability request from the category of "vague future expectation of circumstance" rejected in *Turrisi.*

Alimony and marital property are two separate concepts and are awarded separately, but there is necessarily an interrelationship between the two, and the court is to review the same types of factors in deciding whether and how much to award in each category. *Alston,* 331 Md. at 509 n. 12, 629 A.2d 70 (quoting *McAlear v. McAlear,* 298 Md. 320, 347, 469 A.2d 1256 (1984)). Although Dr. Collins, who is approximately fifty-one years of age and earns approximately $60,000 per year as an assistant professor, received a monetary award and is, in the words of the trial court, presently "self supporting," the court apparently believed that the impending disability award might reduce Dr. Collins' payments from the pension to such an extent that alimony might be appropriate. Reservation on the issue of alimony pending resolution of the disability application does not constitute an abuse of discretion.

On the other hand, reservation does not mean entitlement.

> It means only that when, pursuant to the reservation, application for alimony is made, the chancellor must then weigh the § 11–106 factors and on the basis of that weighing, determine what amount, if any, to allow, and whether to allow it for a definite period or indefinitely. If he does at some point award alimony, it will be subject to future revision under § 11–107.

*Turrisi,* 308 Md. at 530, 520 A.2d 1080. The denial or award of alimony would then be subject to appellate review. We note, however, that Dr. Collins, who is approximately fifty one years of age, earns approximately $60,000 per year as an

assistant professor. Other than the original pension award, we know little of her overall financial situation in relation to that of Lt. Colonel Collins. We are thus unclear as to why the court believed that a disability award might make her non-self-supporting, even if she only had a $60,000 salary. Recognizing that Dr. Collins' marital award is subject to substantial reduction by a disability finding, the court reserved on the issue of alimony. We find no abuse of discretion. Because of the uncertainty of the trial court's reasoning, behind the court's reservations we vacate this portion of the order and remand for further findings regarding the basis for reservation on the issue of alimony and the determination that the Dr. Collins is now "self supporting."

## II. Child Support

Lt. Col. Collins argues that the trial court deviated from the Child Support Guidelines (the "Guidelines") without providing the reasons for the departure. Dr. Collins contends that the Guidelines were properly followed, and that the court's child support award was correct.

The trial court prepared three child support calculations, one for the period from May 1, 2000, through August 31, 2000, the second for the period September 1, 2000, through February 28, 2001, the third covering payments after March 1, 2001:

THE COURT: And there is evidence in this record that private schooling for this child is needed because [it was] not only a practice that the parties employed during their marriage for this child, they agreed to it, the defendant today says he's agreeable to pay his share, so the cost of the private school will be included in child support calculation and the evidence is the tuition is $17,000 a year. Okay.

So having said that, then the child support calculation for purposes of child support and will have to be modified somewhat because I find the plaintiff's actual monthly income from her employment to be $5,672.96 a month. Now, the pension of $1,474 is actually not $1,474, it's less than that because $239 of that is going to be for the survivor benefit that she is going to pay out of her own pocket so she

isn't going to get it, so I will have to make that adjustment on the worksheet.

And Mr. Collins' income, his gross income including his pension is $11,377 a month and he should have subtracted from that whatever the pension, it's $1,474, that's what his subtraction is because that's a gross to him and a net to the plaintiff—

[LT. COL. COLLINS ATTORNEY]: Yes, it is. Well, it's still income to her, with all due respect to the Court, it's [the $239 payment for the survivor benefit] still income to her, it's just that she takes it out to pay for something, it's still income to her.

THE COURT: Well, for the purposes of this child support, it isn't income.

[LT. COL. COLLINS ATTORNEY]: Okay.

THE COURT: And the child's schooling is $1,492 and whatever the percentage is as to what the exact percentage comes to, it will also be the relative percentage that the parties have to be for uninsured medical bills.

\* \* \*

And that was stipulated by the parties that through February of 2001, there is an arrears of $15,594. Unfortunately, I have to redo that too because it's going to change a little bit because of the recalculation of the child support. It's going to change some anyway for that period.

We shall discuss the child support award for each period in turn, as Lt. Col. Collins has complaints about each one. He also alleges error in the court's ruling on the arrearages.

The Guidelines are found at FL § 12–201 *et seq.* They are to be used and followed as they are written. FL § 12–202(a)(2)(v), however, provides:

(v) 1. If the court determines that the application of the guidelines would be unjust or inappropriate in a particular case, the court shall make a written finding or specific finding on the record stating the reasons for departing from the guidelines.

2. The court's finding shall state:

A. the amount of child support that would have been required under the guidelines;

B. how the order varies from the guidelines;

C. how the finding serves the best interests of the child; and

D. in cases in which items of value are conveyed instead of a portion of the support presumed under the guidelines, the estimated value of the items conveyed.

The failure to make such findings constitutes reversible error. *Boswell v. Boswell*, 118 Md.App. 1, 35–36, 701 A.2d 1153 (1997), *aff'd*, 352 Md. 204, 721 A.2d 662 (1998).

Child support is to be determined in accordance with FL § 12–204, which reads in pertinent part:

(a) *Schedule to be used; division among parents; maintenance and alimony awards.*—

(1) The basic child support obligation shall be determined in accordance with the schedule of basic child support obligations in subsection (e) of this section. The basic child support obligation shall be divided between the parents in proportion to their adjusted actual incomes.[14]

(2) (i) If one or both parents have made a request for alimony or maintenance in the proceeding in which a child support award is sought, the court shall decide the issue and amount of alimony or maintenance before determining the child support obligation under these guidelines.

(ii) If the court awards alimony or maintenance, the amount of alimony or maintenance awarded shall be considered actual income for the recipient of the alimony or

---

**14.** "Adjusted actual income" means actual income, which is "income from any source," FL § 12–201(c), minus:

(1) preexisting reasonable child support obligations actually paid;
(2) except as provided in § 12–204(a)(2) of this subtitle, alimony or maintenance obligations actually paid; and
(3) the actual cost of providing health insurance coverage for a child for whom the parents are jointly and severally responsible. FL § 12–201(d).

maintenance and shall be subtracted from the income of the payor of the alimony or maintenance under § 12–201(d)(2) of this subtitle before the court determines the amount of a child support award.

\* \* \*

(d) *Income above schedule levels.*—If the combined adjusted actual income exceeds the highest level specified in the schedule in subsection (e) of this section, the court may use its discretion in setting the amount of child support.

(e) *Basic child support obligation.*—Schedule of basic child support obligations:

[Where the combined adjusted actual income [ [15]] is $10,000 (the highest amount on the chart), the base support obligation is $1,040 per month for one child.]

\* \* \*

(f) *Adjusted basic child support obligation.*—The adjusted basic child support obligation shall be determined by multiplying the basic child support obligation by one and one-half.

\* \* \*

(i) *School and transportation expenses.*—By agreement of the parties or by order of court, the following expenses incurred on behalf of a child may be divided between the parents in proportion to their adjusted actual incomes:

(1) any expenses for attending a special or private elementary or secondary school to meet the particular educational needs of the child; or

(2) any expenses for transportation of the child between the homes of the parents.

---

**15.** "Combined adjusted annual income" means the combined monthly adjusted incomes of both parents. FL § 12–201(e).

## A. May 1, 2000 through August 31, 2000

The Child Support Guidelines Worksheet for this period was as follows:

| | | Mother | Father | Combined |
|---|---|---|---|---|
| 1. | **Monthly Actual Income—Before Taxes** | 5119 | 3685 | 8804 |
| a. | Minus pre-existing child support payment actually paid | | | |
| b. | Minus health insurance premiums (if child included) | 228 | | |
| c. | Minus alimony actually paid | | | |
| d. | Plus/minus alimony awarded in this case | 0 | 0 | |
| 2. | **Monthly Adjusted Actual Income** | 4891 | 3685 | 8576 |
| 3. | **Percentage of Shared Income** | 57% | 43% | |
| | Apply line 2 combined to Child Support Schedule | | | |
| 4. | **Basic Child Support Obligation** | | | |
| a. | Work–Related Child care expenses Code FL, 12–204(g) | | | |
| b. | Extraordinary Medical Expenses Code FL,12–204(h) | | | |
| c. | Additional Expenses Code FL 12–204(i) | 1250 | | 1250 |
| 5. | **Total Child Support Obligation** (Add lines 4, 4a, 4b, and 4c.) | | 2214 | |
| 6. | **Each Parents Child Support Obligation** (line 3 times line 5) | 1261 | 953 | |
| 7. | **Recommended Child Support Order** (Amount from line 6 for the non-custodial parent) | 0 | 953 | |

 Lt. Col. Collins concedes that the Guidelines calculations are correct, but he argues that "the Court failed to

reduce the Appellant's military retired pay reflected on that guidelines work sheet by the cost of the SBP [Survivor Benefit Plan] ($240.00) [16] that [he] maintained and was order [sic] by this Court to 'retroactively maintain' on behalf of the Appellee." The court ordered that, "[b]eginning March 1, 2001, the plaintiff [Dr. Collins] will be responsible, she must pay the survivor benefit[,]" so Lt. Col. Collins was apparently paying for the survivor benefit during this time. Lt. Col. Collins offers no support for his contention that the cost of the survivor benefit should reduce his income, or that as alimony or otherwise, it should be counted as income to Dr. Collins. It "is not our function to seek out the law in support of a party's appellate contentions." *Anderson v. Litzenberg,* 115 Md.App. 549, 578, 694 A.2d 150 (1997); *see also Oroian v. Allstate Ins. Co.,* 62 Md.App. 654, 658, 490 A.2d 1321 (1985) (argument deemed waived because appellants cited no authority in their brief to support their position).

"Income" is defined as "actual income of a parent, if the parent is employed to full capacity." FL § 12–201(b)(1). "Actual income" is defined as:

(1) "Actual income" means income from any source.

\* \* \*

(3) "Actual income" includes:
 (i) salaries;
 (ii) wages;
 (iii) commissions;
 (iv) bonuses;
 (v) dividend income;
 (vi) pension income;
 (vii) interest income;
 (viii) trust income;
 (ix) annuity income;

---

16. We note that the actual cost of the survivor benefit plan is $239. Lt. Col. Collins appears to have rounded this number up.

(x) Social Security benefits;

(xi) workers' compensation benefits;

(xii) unemployment insurance benefits;

(xiii) disability insurance benefits;

(xiv) alimony or maintenance received; and

(xv) expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business to the extent the reimbursements or payments reduce the parent's personal living expenses.

(4) Based on the circumstances of the case, the court may consider the following items as actual income:

(i) severance pay;

(ii) capital gains;

(iii) gifts; or

(iv) prizes.

(5) "Actual income" does not include benefits received from means-tested public assistance programs, including temporary cash assistance, Supplemental Security Income, food stamps, and transitional emergency, medical, and housing assistance.

FL § 12–201(c).

■■■ The survivor benefit payment clearly was not actual income to Dr. Collins during this time period. We do not believe that the trial court clearly erred or abused its discretion in failing to subtract the amount of the survivor benefit from Lt. Col. Collin's income on the Guidelines form for this period. With respect to the Child Support Guidelines set forth below for the two subsequent time periods at issue in this case, the entire $1,474 monthly payment is considered as income to Dr. Collins.[17]

---

**17.** This amount includes the amount that Dr. Collins must pay to maintain the survivor benefits. Dr. Collins must pay $239 a month for that benefit, so she in effect "nets" $1,235 a month from the pension plan payment.

■ Finally, Lt. Col. Collins maintains, with respect to all three support awards, that crediting Dr. Collins for $228 a month for the maintenance of health care was erroneous. He argues that she testified only to paying $40.00 per month for Jason's health insurance. Lt. Col. Collins does not point out where in the record this testimony can be found.[18] Dr. Collins ignores this argument altogether.

After conducting a search of the voluminous record in this case, we found that, during cross-examination at the merits hearing, Dr. Collins stated that she pays $40 a month for Jason's dental and health insurance. Moreover, this same amount appears on at least one of her Financial Statements, entered as an exhibit at the hearing. Although the trial court in this case was very thorough, we are unable to find any evidentiary reference to Dr. Collins paying $228 in conjunction with health insurance premiums. Consequently, we shall remand this case for a determination on the correct amount spent by Dr. Collins on health insurance premiums for Jason in each of the periods covered by the child support awards.

### B. September 1, 2000 through February 28, 2001

The Child Support Guidelines Worksheet for this period was as follows:

| | Mother | Father | Combined |
|---|---|---|---|
| 1. Monthly Actual Income—Before Taxes | 5673 | 11377 [19] | 17050 |
| a. Minus pre-existing child support payment actually paid | | | |

---

18. We remind counsel that a brief shall include.

A clear concise statement of the facts material to a determination of the questions presented, except that the appellee's brief shall contain a statement of only those additional facts necessary to correct or amplify the statement in the appellant's brief. **Reference shall be made to the pages of the record extract supporting the assertions.** Rule 8–504(a)(4) (emphasis supplied).

19. Lt. Col. Collins had accepted a job by this point. His monthly income reflects his salary in addition to his pension.

| | | | |
|---|---|---|---|
| b. Minus health insurance premiums (if child included) | 228 | | |
| c. Minus alimony actually paid | | | |
| d. Plus/minus alimony awarded in this case | 1474 | − 1474 | |
| **2. Monthly Adjusted Actual Income** | 6919 | 9903 | 16822 |
| **3. Percentage of Shared Income** | | | |
| Apply line 2 combined to Child Support Schedule | 41.1% | 58.9% | |
| **4. Basic Child Support Obligation** | | | 1382.5 |
| a. Work–Related Child care expenses Code FL, 12–204(g) | | | 0 |
| b. Extraordinary Medical Expenses Code FL, 12–204(h) | | | 0 |
| c. Additional Expenses Code FL 12–204(i) | 1250 | | 1250 |
| **5. Total Child Support Obligation** (Add lines 4, 4a, 4b, and 4c.) | | | 2632.5 |
| **6. Each Parents Child Support Obligation** (line 3 times line 5) | 1082 | 1550 | |
| **7. Recommended Child Support Order** (Amount from line 6 for the non-custodial parent) | 0 | 1550 | |

In addition to the true amount of the health insurance premium being paid by Dr. Collins, which we have addressed *supra*, appellant complains that the trial court deviated from the Guidelines. Lt. Col. Collins has agreed to be responsible for his share of Jason's tuition. Therefore, we focus on the "basic child support obligation" of $1,382.50, which exceeds the $1,040 maximum basic obligation in the Guidelines. He argues that, because Dr. Collins did not request child support in excess of the Guidelines, she was not entitled to such an award. In addressing this issue, we shall assume, *arguendo,*

that the health insurance premium is accurately reflected on the award sheet.

It does not matter whether Dr. Collins requested a child support award in excess of the maximum basic obligation actually calculated in the Guidelines. Because the parties' combined adjusted actual income exceeds $10,000, the maximum income expressly addressed by the Guidelines, it is within the trial court's discretion to set the amount of child support. FL § 12–204(d).

Lt. Col. Collins implies that FL § 12–204(d)[20] conflicts with FL § 12–202(a)(2)(v).[21] We must interpret these two provisions in the context of the statutory scheme as a whole, *Ridge Heating*, 366 Md. at 350–51, 783 A.2d 691, and in such a way as not to render a "clause, sentence, or phrase ... 'surplusage, superfluous, meaningless, or nugatory.'" *State v. Pagano*, 341 Md. 129, 134, 669 A.2d 1339 (1996) (quoting *Montgomery County v. Buckman*, 333 Md. 516, 524, 636 A.2d 448 (1994)).

We are not persuaded that exercising discretion pursuant to FL § 12–204(d) requires a court to make the specific findings under FL § 12–202(a)(2)(v), and Lt. Col. Collins points us to no cases that so hold. FL § 12–202(a)(2)(v)(2)(A) requires

---

**20.** FL § 12–204(d) provides: "If the combined adjusted actual income exceeds the highest level specified in the schedule in subsection (e) of this section, the court may use its discretion in setting the amount of child support."

**21.** FL § 12–204(a)(2)(v) provides:
 (v) 1. If the court determines that the application of the guidelines would be unjust or inappropriate in a particular case, the court shall make a written finding or specific finding on the record stating the reasons for departing from the guidelines.
 2. The court's finding shall state:
 A. the amount of child support that would have been required under the guidelines;
 B. how the order varies from the guidelines;
 C. how the finding serves the best interests of the child; and
 D. in cases in which items of value are conveyed instead of a portion of the support presumed under the guidelines, the estimated value of the items conveyed.

that the court set forth "the amount of child support that would have been required under the guidelines." In cases where the parents' combined adjusted actual income exceeds $10,000, this amount is a matter for the court's discretion. In other words, there is no "departure" from the Guidelines.

The Court of Appeals has held that, because the General Assembly declined to extend the Guidelines schedule, that it is proper in such instances for the court, for guidance, to "extrapolate" from the schedule, but ultimately the decision is one of discretion balancing the best interests and needs of the child with financial and other considerations of the parties. *Voishan v. Palma*, 327 Md. 318, 328–29, 609 A.2d 319 (1992).

> Extrapolation from the schedule may act as a "guide," but the judge may also exercise his or her own independent discretion in balancing
>
>> "the best interests and needs of the child with the parents' financial ability to meet those needs. Factors which should be considered when setting child support include the financial circumstances of the parties, their station in life, their age and physical condition, and expenses in educating the children." (Citations omitted).
>
> *Unkle v. Unkle*, 305 Md. 587, 597, 505 A.2d 849, 854 (1986). These principles expressed in the pre-guidelines *Unkle* decision are consistent with the underlying concept that the child's needs be met as they would have been absent the parents' divorce.

*Voishan*, 327 Md. at 329, 609 A.2d 319 (footnote omitted).

That the child support award exceeds the Guidelines schedule by $342.50[22] does not constitute an abuse of discretion. We will remand for reconsideration only on the issue of health care premiums.

---

**22.** If the court had followed the Guidelines without extrapolating, the base amount of monthly support, excluding Jason's private school, would have been $1,040.

## C. After March 1, 2001

The Child Support Guidelines Worksheet for this period was as follows:

| | | Mother | Father | Combined |
|---|---|---|---|---|
| **1.** | **Monthly Actual Income–Before Taxes** | 5443 | 11377 | 16820 |
| a. | Minus pre-existing child support payment actually paid | | | |
| b. | Minus health insurance premiums (if child included) | 228 | | |
| c. | Minus alimony actually paid | | | |
| d. | Plus/minus alimony awarded in this case | 1474 | – 1474 | 16592 |
| **2.** | **Monthly Adjusted Actual Income** | 6689 | 9903 | |
| **3.** | **Percentage of Shared Income** | 40.3% | 59.7 | |
| | Apply line 2 combined to Child Support Schedule | | | |
| **4.** | **Basic Child Support Obligation** | | | 1370 |
| a. | Work–Related Child care expenses Code FL, 12–204(g) | | | 0 |
| b. | Extraordinary Medical Expenses Code FL, 12–204(h) | | | 0 |
| c. | Additional Expenses Code FL 12–204(i) | 1492 | | 1492 |
| **5.** | **Total Child Support Obligation** (added lines 4, 4a, 4b, and 4c.) | | | |
| **6.** | **Each Parents Child Support Obligation** (line 3 times line 5) | 1153 | 1709 | |
| **7.** | **Recommended Child Support Order** (Amount from line 6 for the non-custodial parent) | 0 | 1709 | |

Lt. Col. Collins makes the same complaints about the basic child support obligation finding on this worksheet as he did on

the previous worksheet. Again, we find no abuse of discretion. We shall remand this award only with respect to the health insurance premium.

### D. Arrearages

Because the actual amount of support might change, we leave it to the trial court to address the issue of arrearages on remand, and to make any changes that might need to be made in this respect.

### III. Attorneys' Fees

■■■ Lt. Col. Collins' final argument concerns the award of attorneys' fees. He argues that "the Chancellor is called upon to set forth in writing or on the record the evaluation that he has made of the statutory factors in arriving at such an award." He specifically complains that the court did not take the parties' financial positions into account. Dr. Collins contends that the court's reasons were set forth in its oral ruling and were sufficient.

The trial court's oral ruling was, in part, as follows:

There is also a request for attorneys fees and the defendant has suggested on [sic] more than once in this litigation that the plaintiff's attorneys's fees are in part what they are because it was her decision and she chose to litigate in two places. That had she just consented to and submitted to the South Dakota litigation, she would have been divorced a year ago and the entire case would have been over way before now. She wouldn't have had to spend as much money.

* * *

So it's clear from law and the law we all understand, South Dakota has and had absolutely no jurisdiction over this child, could not award custody over this child, visitation, child support. So the plaintiff in this case had to participate in the South Dakota case to get those issues if no more, sent back here to the place where there was jurisdiction and she had to incur attorneys fees to do that.

* * *

Furthermore, it cannot be even debated that for the first several months of separation, he didn't pay an appropriate amount of support for his child and he did without notice, I find without appropriate notice, arrange for his name to be removed from most obligations that were jointly held by he and his wife and he was able to do it and most people aren't able to do it the way he did it and I am not saying he did anything illegal but apparently because of his relationship with the military, he is permitted to take certain actions that the average layperson isn't and he did them and some subsequent reaction to that by utility companies. Certainly I accept the testimony of the plaintiff, she was surprised when she found out some of her utilities were cut off.

So he just didn't do it the right way and generated additional litigation. This business that has arisen regarding the earnings withholding order is, I certainly can't hold him personally responsible for it but it's his company and the issue of the manner in paying and [the] inefficient way it's being administered at least up to this point, he has more ability to get it straightened out than anyone else does, certainly [than] his former wife.

So litigation that was caused, that was in great part caused by his behavior and the manner in which he treated this litigation. So I am going to assess attorneys fees against him of $17,500 and I will enter a judgment in favor of Mrs. Collins for $17,500.

Although Lt. Col. Collins fails to point us to the statutory factors that must be addressed by the trial court,[23] they are set forth in FL §§ 7–107 (concerning a judgment of divorce); 8–214 (concerning marital property awards); 11–110 (concerning alimony proceedings); and 12–103 (concerning child custody, support or visitation). All of these statutes require the

---

**23.** Rule 8–504(a)(7) requires the "citation and verbatim text of all pertinent constitutional provisions, statutes, ordinances, rules, and regulations except that the appellee's brief shall contain only those not included in the appellant's brief."

court to consider the financial resources and financial needs of both parties and whether there was substantial justification for bringing, maintaining, or defending the suit.

 "When the case permits attorney's fees to be awarded, they must be reasonable, taking into account such factors as labor, skill, time, and benefit afforded to the client, as well as the financial resources and needs of each party." *Petrini v. Petrini,* 336 Md. 453, 467, 648 A.2d 1016 (1994).

> Decisions concerning the award of counsel fees rest solely in the discretion of the trial judge. **The proper exercise of such discretion is determined by evaluating the judge's application of the statutory criteria set forth above as well as the consideration of the facts of the particular case. Consideration of the statutory criteria is mandatory in making the award and failure to do so constitutes legal error.** An award of attorney's fees will not be reversed unless a court's discretion was exercised arbitrarily or the judgment was clearly wrong.

*Petrini,* 336 Md. at 468, 648 A.2d 1016 (citations omitted; emphasis supplied). *See also Barton v. Hirshberg,* 137 Md. App. 1, 24, 767 A.2d 874 (2001). The "trial court does not have to recite any 'magical' words so long as its opinion, however phrased, does that which the statute [FL § 12–103(b) ] requires." *Beck v. Beck,* 112 Md.App. 197, 212, 684 A.2d 878 (1996), *cert. denied,* 344 Md. 717, 690 A.2d 523 (1997).

It appears that the award of $17,500 was a compromise amount reached by the trial court. During closing argument, Dr. Collins' counsel explained that the South Dakota lawyer's fees were approximately $2,300 and that the bill from her Maryland law firm was in excess of $25,000. The petition for attorneys' fees included two attachments, one of which was the billing statement for the South Dakota attorney, whose fees and costs totaled $2,324.11.[21] The other attachment was a billing statement from Dr. Collins' Maryland attorney, whose

---

**24.** The bill reflected a $500 payment.

fees and costs totaled $17,249.85.[25] In the petition, Dr. Collins' attorney estimated that her fees in connection with the trial would amount to $8,800. This left Dr. Collins with approximately $22,875 in unpaid attorneys' fees and costs.

The trial court clearly addressed the statutory factor of justification. With respect to the first factor, the parties' financial situation, and the second factor, the needs of the parties, we note that Lt. Col. Collins put the court on notice that he did not have the means to pay the attorneys' fees:

[LT. COL. COLLINS' ATTORNEY]: Your Honor, with all due respect, I am not arguing with the Judge's decision but if he is going to be paying a monetary award of approximately $9,400 if I added it correctly and the arrearage [sic] is $17,500, he has no means to pay that.

THE COURT: Okay.

[LT. COL. COLLINS' ATTORNEY]: You know, I am not arguing with the decision.

THE COURT: That's okay. Ma'am, I—

[LT. COL. COLLINS' ATTORNEY]: But he has no means to pay those.[26]

The court recognized throughout its oral ruling that Dr. Collins' attorneys' fees were a financial burden for her and were caused primarily by Lt. Col. Collins' actions by litigating in two separate jurisdictions and by his refusal to cooperate in the Maryland action. The court also recognized that Lt. Col. Collins' "gross income including his pension is $11,377 a month."

In addition, the court found that Lt. Col. Collins both deliberately and willfully underpaid support for a lengthy period of time and that he had, in some cases, dissipated marital assets. Despite the fact that the court made no

---

25. The amount owed was reflected as $12,249.85, the amount billed over and above a $5,000 retainer.

26. Lt. Col. Collins' attorney said at oral argument that she was not disputing an award of counsel fees, but that she was questioning the amount of that award.

specific findings, the record suggests that the court believed that Lt. Col. Collins was capable of paying attorneys' fees. It also apparently believed that Dr. Collins was able to pay a portion of her counsel fees, as she was awarded approximately $5,400 less than the amount owed her attorneys. We are satisfied that the court considered the applicable statutory factors.

The reasonableness of the attorney's fees must be analyzed once evidence is presented in favor of attorney's fees. *Rauch v. McCall*, 134 Md.App. 624, 639, 761 A.2d 76 (2000), *cert. denied*, 362 Md. 625, 766 A.2d 148 (2001) (citing *Holzman v. Fiola Blum, Inc.*, 125 Md.App. 602, 639, 726 A.2d 818 (1999)). In light of the amount of the fees awarded in this case, we believe that some express discussion regarding the reasonableness of the fees in light of such factors as labor, skill, time, and benefit received is necessary. Accordingly, we vacate the award of attorney's fees and remand for further proceedings on the reasonableness of the fees awarded.

**JUDGMENT AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID TWO–THIRDS BY APPELLANT AND ONE–THIRD BY APPELLEE.**