Kimberly FAULKNER, Appellant,

v.

Steven GOLDFUSS, Appellee.

No. S–9658.

Supreme Court of Alaska.

May 10, 2002.

Kimberly L. Faulkner, pro se, North Pole.

Lynn E. Levengood, Downes, MacDonald & Levengood, P.C., Fairbanks, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Kimberly (Kim) Faulkner raises numerous issues concerning child support, child custody, and property division in her divorce from Steven Goldfuss. We affirm as to most of these issues, including child custody. But because it was error to disallow Kim a deduction for the depreciation of several rental properties, to include as gross income child support Kim received for a child from a previous relationship, and to subtract the amount of that child support from her proposed deduction under Alaska Civil Rule 90.3(a)(1)(C), we vacate the child support award and remand for a recalculation of child support. And because the superior court valued the marital share of Kim's military retirement based on the number of months she was employed during coverture, rather than the number of points she earned during coverture, we remand for additional findings.

## II. FACTS AND PROCEEDINGS

Kimberly Faulkner and Steven Goldfuss married in October 1995 in Anchorage. They had two children, Ryan and Adrian. Kim also had two minor children from previous relationships, Dominique (Nick) and Lolitta. Steven adopted Lolitta soon after he married Kim.

During a 1997 separation Kim and Steven entered into a post-nuptial agreement, which stipulated to the distribution of their separate and marital property upon dissolution or divorce. They also agreed to sell their jointly owned business, Sail N Fun.

In January 1999 Kim filed a complaint for divorce. In December 1999 the parties entered into a written settlement agreement regarding child custody and visitation. Among other things, it provided that the parties would share physical custody of the children; it also specified the percentage of time each child was to spend with each parent.

After a trial in January 2000, the superior court granted the parties a divorce. It awarded Steven sole legal custody of Ryan, Adrian, and Lolitta. Stating that it was attempting "[t]o effectuate as closely as ... it [could] ... the [December 1999 settlement] agreement between the parties," the court awarded the parties shared physical custody of the children. The superior court quantified the percentage of time each child would reside with each parent under the custody

order. It also divided the parties' real and personal property, and ordered Kim to pay child support of $288.39 per month. Kim appeals.

## III. DISCUSSION

### A. Standard of Review

██ We review a child support award for abuse of discretion.[1] We will find an abuse of discretion only "when, based on a review of the whole record, 'we are left with a definite and firm conviction that a mistake has been made.' "[2] The proper method of calculating child support is a question of law, which we review de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[3]

██ The superior court has broad discretion in child custody matters.[4] We will reverse the superior court's resolution of custody issues only if we are convinced that the record shows an abuse of discretion, or if controlling factual findings are clearly erroneous.[5] An abuse of discretion is established if the superior court has considered improper factors in making its custody determination, has failed to consider statutorily mandated factors, or has assigned disproportionate weight to particular statutory factors while ignoring others.[6] A factual finding is clearly erroneous if "a review of the entire record leaves us with a definite and firm conviction that the trial court has made a mistake."[7]

██ "The superior court has broad discretion when dividing property in a divorce action."[8] Property division in a divorce action consists of three steps: (1) determining what property is available for distribution; (2) valuing the property; and (3) allocating the property equitably.[9] We review the superior court's determination of the property available for distribution for abuse of discretion; we review de novo the legal conclusions the superior court reaches while making this determination.[10] The valuation of available property is a factual determination that we review under the clearly erroneous standard.[11] We review the superior court's equitable allocation of property for abuse of discretion, reversing only if the allocation is clearly unjust.[12]

### B. Child Support

The superior court ordered Kim to pay child support of $288.39 per month. Kim contends that the superior court erroneously calculated her child support obligation, because the court (1) disallowed a deduction for depreciation; (2) imputed as income to her the rental value of her apartment; (3) included as income child support she receives for a child of a previous marriage; (4) failed to make findings regarding her claimed deduction for net operating losses; and (5) miscalculated the percentage of time each parent has physical custody of the children.[13]

#### 1. It was error to deny Kim a deduction for the depreciation of her rental properties.

██ Kim's child support guidelines affidavit claimed a $15,000 deduction for the

---

1. See *Gallant v. Gallant,* 945 P.2d 795, 798 (Alaska 1997).

2. *Schuyler v. Briner,* 13 P.3d 738, 741 (Alaska 2000) (quoting *State, Dep't of Revenue, CSED v. Pealatere,* 996 P.2d 84, 86 (Alaska 2000)).

3. See *Spott v. Spott,* 17 P.3d 52, 55 (Alaska 2001).

4. See *Evans v. Evans,* 869 P.2d 478, 479 (Alaska 1994).

5. See *Farrell v. Farrell,* 819 P.2d 896, 898 (Alaska 1991).

6. See *Evans,* 869 P.2d at 480.

7. *Id.* at 479 (citing *Money v. Money,* 852 P.2d 1158, 1161 (Alaska 1993)).

8. *Berry v. Berry,* 978 P.2d 93, 95 (Alaska 1999) (citations omitted).

9. *See id.*

10. *See id.*

11. *See id.*

12. *See id.* (citing *Compton v. Compton,* 902 P.2d 805, 808 n. 2 (Alaska 1995)).

13. Kim also argues that the court miscalculated interim child support, and precluded her from presenting relevant evidence at an April 7, 1999 hearing regarding interim child support. But Kim concedes that these alleged errors are "not reversible in many of [their] effects." We therefore do not reach the merits of Kim's arguments regarding interim child support.

depreciation of several rental properties.[14] Citing *Hilderbrand v. Hilderbrand,*[15] the superior court disallowed Kim's proposed depreciation deduction. Kim appeals this ruling.

The commentary to Alaska Civil Rule 90.3 states: "Income from self-employment, *rent,* royalties, or joint ownership of a partnership or closely held corporation includes the gross receipts *minus the ordinary and necessary expenses* required to produce the income."[16] We have held that the superior court should normally allow a deduction for the straight line depreciation—the difference between the original cost of an asset and its scrap value divided by the estimated useful life of the asset—of a child support obligor's business real estate as an ordinary and necessary business expense.[17]

But we held in *Hilderbrand* that a depreciation deduction is not allowed if it could not be claimed for tax purposes.[18] Citing *Hilderbrand,* the trial court disallowed Kim's proposed depreciation deduction. The court did not find, however, that the proposed deduction could not be claimed for tax purposes. Indeed, Schedule E of the parties' 1995–97 federal income tax returns, which Kim submitted to the superior court, claimed a depreciation deduction for the same rental properties, and the record contains no evidence that the Internal Revenue Service denied those deductions. We therefore vacate the child support award and remand for recalculation of Kim's child support obligation, allowing Kim a deduction for the straight line depreciation of her rental properties.

**2. The fair market rental value of Kim's apartment was not imputed as income to her.**

Kim asserts that the superior court erred by imputing as income to her the fair market rental value of the apartment in which she resides. Kim lives rent-free in one unit of a duplex her brother owns. In return, she manages the property, collects the rent, and pays the mortgage, utilities, and taxes. Steven argued below that the superior court should impute as income to Kim the difference between the fair market rental value of the apartment and Kim's expenses managing the property. Although the superior court's amended child support order disallowed a $4,867.11 deduction for Kim's expenses attributable to managing the duplex, the court imputed no income to Kim. We therefore perceive no error that harmed Kim.[19]

**3. It was error to include as gross income and to subtract from Kim's proposed Civil Rule 90.3(a)(1)(C) deduction the child support Kim receives for Nick.**

Kim received $1,770 in child support for Nick, a child of a previous marriage. The child support order in the present case included this amount in Kim's gross income. The order also subtracted $1,770 from Kim's proposed deduction under Civil Rule 90.3(a)(1)(C) for "child support for children from prior relationships living with the parent." Kim argues that it was error to in-

---

**14.** Kim submitted several child support guidelines affidavits to the superior court. The superior court considered the affidavit submitted on January 21, 2000.

**15.** 962 P.2d 887 (Alaska 1998).

**16.** Alaska R. Civ. P. 90.3 cmt. III.B (emphasis added).

**17.** *See, e.g., Hilderbrand,* 962 P.2d at 889–90; *Nass v. Seaton,* 904 P.2d 412, 416–17 (Alaska 1995) (holding it was error to disallow straight line depreciation for portion of child support obligor's residence obligor used in his business); *Eagley v. Eagley,* 849 P.2d 777, 781 (Alaska 1993) (allowing deduction for straight line depreciation of child support obligor's business real estate as ordinary and necessary business expense).

**18.** *See Hilderbrand,* 962 P.2d at 890.

**19.** Steven argues that the superior court erred by failing to impute as income to Kim the rental value of her apartment, and that this error offsets and renders harmless any error in failing to give Kim a deduction for depreciation of her rental properties. *See supra* Part III.B.1. But the imputed income question is a separate issue, which only by complete coincidence could offset the error of disallowing the depreciation deduction. We therefore cannot affirm the child support order on this alternative ground. And because Steven did not cross-appeal the imputed income question, we decline to reach its merits.

clude as income child support she received for Nick, and to reduce her Civil Rule 90.3(a)(1)(C) deduction by this amount. We agree.

The commentary to Civil Rule 90.3 states that "[c]hild support is not income."[20] "Although we have not adopted or approved the commentary, we often rely upon it 'for guidance in child support matters.' "[21] We conclude here that it was error to include as gross income child support Kim received for Nick.

We also agree that it was error to reduce Kim's Civil Rule 90.3(a)(1)(C) deduction by $1,770—the amount of child support she received from Nick's non-custodial parent. Civil Rule 90.3(a)(1)(C) provides that a child support obligor may deduct from gross income "child support for children from prior relationships living with the parent, calculated by using the formula provided by [Rule 90.3.]" The commentary elaborates:

> A deduction . . . is allowed for the support of the children of prior relationships even if the party is the custodial parent of the "prior" children and does not make child support payments to the other parent of the children. In this situation support provided directly to the children is calculated by Rule 90.3 as if the children from the prior relationship were the only children.[22]

Neither Civil Rule 90.3 nor its commentary provides that the amount of a Rule 90.3(a)(1)(C) deduction must be reduced by the amount of child support a custodial parent receives for the child for whom the deduction is claimed. Rather, Rule 90.3(a)(1)(C) provides that a custodial parent's gross income may be reduced by *that parent's* contribution, as calculated under Rule 90.3, to the support of a child from a previous relationship. The total cost of sup-

porting a child is the sum of both parents' contributions as calculated under Rule 90.3, and the custodial parent's contribution is independent of and in addition to the non-custodial parent's contribution. It was therefore error to reduce Kim's proposed Rule 90.3(a)(1)(C) deduction by the amount of child support she received from Nick's non-custodial parent.

These two errors require remand for the purpose of recalculating Kim's support obligation based on her adjusted annual income.

### 4. It was not error to fail to make findings regarding the deductibility of net operating losses.

Kim next argues that the superior court erred by failing to make findings regarding whether and to what extent she could deduct previously incurred net operating losses from gross income. Federal taxpayers are permitted by 26 U.S.C. § 172 to carry over and deduct net operating losses for a period of twenty taxable years following the taxable year of the loss. Civil Rule 90.3 and its commentary do not specify whether previously incurred net operating losses may be deducted from an obligor's gross income when calculating child support. But not all deductions that the IRS allows may be deducted from an obligor's income as determined under Rule 90.3.[23] Because previously incurred net operating losses do not reflect upon an obligor's present ability to pay child support,[24] we hold that they may not be deducted from an obligor's income when calculating child support. The superior court did not err.

### 5. When child support is recalculated on remand, it should be based on the actual physical custody awarded.

Kim also contends that the superior court miscalculated the percentage of time each

---

20. Alaska R. Civ. P. 90.3 cmt. III.A.

21. *See State, Child Support Enforcement Div. v. Bromley,* 987 P.2d 183, 194 (Alaska 1999) (quoting *Bunn v. House,* 934 P.2d 753, 755 n. 7 (Alaska 1997)).

22. Alaska R. Civ. P. 90.3 cmt. III.D.

23. *See* Alaska R. Civ. P. 90.3 cmt. III.B ("Ordinary and necessary expenses do not include amounts allowable by the IRS for the accelerated

component of depreciation expenses, investment tax credits, or any other business expenses determined by the court to be inappropriate.").

24. *See Zimin v. Zimin,* 837 P.2d 118, 123 (Alaska 1992) ("[T]he goal of the Rule 90.3 guidelines is to obtain a realistic estimate of an obligor's adjusted annual income. . . .").

parent has physical custody of the children under the court's child custody order. Under Civil Rule 90.3(b)(2), when parents are awarded shared physical custody, a parent's child support obligation depends in part on "the percentage of time the other parent will have physical custody of the children." The superior court based its child support award on its physical custody award, and assumed that the two boys would be in Steven's custody sixty-three percent of the year and in Kim's custody thirty-seven percent of the year, and that Lolitta would be in Steven's custody sixty percent of the year and in Kim's custody forty percent of the year. Kim argues that she actually has custody of Lolitta only thirty-six percent of the year and custody of the boys only twenty-nine percent of the year. Steven does not offer different figures, but argues that this issue was raised and resolved after trial and asserts that the court's calculations were based on the time the children actually spent with each parent.

Kim's terse appellate arguments simply refer us to the record and contain no meaningful discussion of the issue. Kim bears the burden of demonstrating on appeal that the superior court erred. Accurately counting the days awarded requires access to the Fairbanks North Star Borough school calendar, and neither party has included it in the record. We therefore cannot definitively count the days. But as far as we can tell, it appears that per the award Lolitta was actually to be in Kim's physical custody about thirty-nine percent of the year. And it appears that per the award the boys were actually to be in Kim's physical custody about thirty-five percent of the year. It therefore appears that Kim's child support

obligation may have been based on custody divisions that were slightly inaccurate.

▮ We assume that these minor differences would not justify reversal. But because child support must be recalculated anyway for the reasons discussed above, the recalculated award should be based on the exact physical custody actually awarded the parties.[25]

### C. Child Custody

**1. The superior court did not err when it deviated from the parties' custody agreement, because it did so after expressly finding that the children's bests interests required that deviation, and because those findings were not clearly erroneous.**

▮ Kim argues that it was an abuse of discretion to enter the custody award because it deviated significantly from the terms of the parties' settlement agreement.

▮▮ "In making any custody determination—whether following a contested trial or upon the parties' agreement—the superior court must base its decision on the best interests of the child."[26] Although a custody agreement does not bind the superior court, the court should deviate from the terms of a custody agreement only upon finding on the record that the child's best interests justify a deviation.[27] The legislature has stated that "it is generally desirable to assure a minor child frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to

---

25. In Part III.C.1 we discuss the deviation between the agreed-upon custody and the awarded custody. We assume there that the award actually achieved what the superior court intended, but allow the court to revisit custody if the award did not achieve the numerical division the court intended.

26. *Crane v. Crane,* 986 P.2d 881, 887 (Alaska 1999) (citations omitted).

27. *See McClain v. McClain,* 716 P.2d 381, 385 (Alaska 1986) (holding that custody agreement "has no binding force on the court [and that] [t]he contractual intent of the parties is irrele-

vant. The court must independently determine what arrangement will best serve the child's interests."); *see also Crane,* 986 P.2d at 885 ("When a stipulation is admitted by both parties or their attorneys in open court and there is no dispute as to the material terms of the settlement, the stipulation is enforceable between the parties absent fraud, duress, or concealment of other facts showing the agreement was not made voluntarily and with full understanding. However, when the subject matter of the agreement is child custody, the agreement must also meet the best interests of the children.") (citations omitted).

share the rights and responsibilities of child rearing."[28]

In December 1999 Kim and Steven entered into a settlement agreement regarding child custody and visitation. It provided that the parties would share physical custody of the children: Ryan and Adrian would reside with Steven for approximately sixty percent of the year and with Kim for approximately forty percent of the year; Lolitta would reside with Steven and Kim each for approximately fifty percent of the year.

The superior court's written custody and visitation findings discussed the children's best interests. The court stated that it believed that it was "paramount and in the best interest" of the children to have one household to call "home," and to limit the time of their separation; it nonetheless expressed its interest in attempting to accommodate the parties' intentions in their custody agreement. The court also mentioned the best interests in specifying the visitation.

The superior court's oral findings, which counsel did not fully incorporate into the proposed written findings and conclusions, were more specific. The oral findings expressed reservations about the parties' proposed agreement for shared custody and specifically indicated that the court was willing to accept the agreement only insofar as it served the children's best interests. The court's opening remarks about custody described the need for "a hard look at the settlement agreement." Before turning to the settlement agreement, the superior court expressly emphasized its concurrence in two of the recommendations made by child custody investigator Jeanne Nay:

> [B]efore I take a hard look at the settlement agreement, I guess I want to express some agreement and some disagreement with Ms. Nay's report. Her testimony, I think, perhaps was more helpful than her report. But a couple of common threads emerge from both her testimony and from the recommendations in the report. First, and perhaps foremost, she stated the opinion that she thinks it's very important for all three of these kids to have a primary residence, a place that they can regard as home and unambiguously so. That's a concern I very much share, and I think that it is in the interest of all three kids to be able to regard one household as home to establish the level of continuity necessary to their belief that they have a home.

> She also expressed significant concern about the kids staying together, and when she said that she was clearly referring—I asked her, she said she meant all three kids. She thinks it's extremely important and serves equally the interests for the boys and Lolitta that they spend as much time together, [and] that they be separated as little as possible. I also share that concern, and I'm going to craft an order that addresses those two concerns as serving the kids' interests perhaps above and beyond all other concerns that certainly are important.

These comments confirm that the superior court believed that the children's best interests required it to fashion an award that would keep all three children together as much as possible in a single household—one that they would unambiguously regard as their home—and that this goal would prevail "above and beyond" the parties' interest in their custody agreement.

The superior court then turned to the custody agreement: "What I want to do is go through the stipulation, the settlement agreement, and focus on what I see to be the two overriding concerns as affecting the kids' best interest." Concerning the agreement's two most controversial features—the 60/40 split as to Bryan's and Adrian's custody and the 50/50 split as to Lolitta—the judge expressed reluctance to accept the agreement as written, again stressing his adoption of the custody report's views:

> I have some significant hesitation as to the breakdown of 60/40 as to custody, and that hesitation is pretty much identical with the hesitation that Ms. Nay expressed. Nonetheless, I think that her principal concerns can be addressed in the context of the stipulation, and I'm not going to reject it.

**28.** Ch. 88, § 1(a), SLA 1982.

As I say, though, I'm accepting that 60/40 split with a certain degree of hesitation.

The second one, my hesitation is even greater, but, again, I'm willing to accept it, perhaps with some emphasis on the word "approximately." I will do my best to create a 50/50 split with regard to custody, physical custody, of Lolitta, but it's not going to be perfect. Again, I have some real hesitation as to whether that provision is reconcilable with my overriding concern to make sure that the kids have a single home.

These oral comments amount to specific findings that it was in the children's best interests to deviate from the parties' proposed custody arrangement.

It also appears that these findings are supported by the evidence cited by the superior court. The child custody investigator wrote a detailed and thorough custody report. She concluded that the three children desperately needed one parent to serve as their primary parent at a single, stable household to call their home. The investigator also emphasized that all three children were closely bonded, particularly stressing the close bond between Lolitta and the older son, and the older son's emotional reliance on Lolitta. The child custody investigator concluded that a shared custody arrangement could not meet the children's needs and that the award of primary custody to one or the other would be necessary.

The investigation also produced evidence that negatively reflected on Kim's ability to parent Lolitta and perhaps the other children. This evidence caused the investigator to question Kim's ability to meet the children's needs if she were their primary parent. The child custody investigator had reservations about Steven as well, but her exhaustive analysis of the statutory best interests factors led her to conclude that Steven would clearly be the superior primary parent for all three children. The child custody investigator thoroughly discussed the reasons for this opinion.

The child custody investigator testified at length at the evidentiary hearing. She there confirmed and elaborated on the conclusions reached in her report. She explained her reasons for believing that Kim's impulsive and unstable behaviors had often placed her children in physical and emotional danger; she described various ways in which Steven would be the superior parent; she confirmed her belief that all three children should share the same primary household and visitation schedule; and when specifically asked by the superior court if she thought that the court should override the parties' custody agreement, Nay answered "Yes," firmly maintaining her position that children's best interests would be served only by awarding primary custody to Steven.

The child custody investigator's custody report and testimony reveal that her conclusions were based on compelling, case-specific evidence, and not abstract notions about good parenting or the needs of typical children.

In short, the superior court had before it evidence amply supporting its findings that the children's best interests warranted some deviation from the parties' proposed custody arrangement. The superior court's findings justified deviation from the agreement, and because there was compelling evidence supporting those findings, the superior court did not clearly err in making those findings. We therefore affirm the custody and visitation award.[29]

---

**29.** Kim claims that the superior court miscalculated the effect of its award. As noted above in Part III.B.5, the number of days of actual physical custody and visitation awarded to Kim for all three children may have been slightly lower than the superior court intended. This deviation is irrelevant in context of Kim's argument that the court erred by failing to follow the parties' custody agreement. The superior court's reasons for choosing not to follow the parties' agreement are unaffected by any slight numerical deviations in the physical custody actually awarded. Because the superior court will have to accurately determine on remand the custody and visitation previously awarded, it may conclude that the award did not in fact achieve what the superior court intended. We leave it to the superior court to adjust visitation if that is necessary to achieve its previously expressed intentions.

Kim also argues that it was error to award her custody on weekends when she drills with the National Guard. Because we remand for further proceedings, we do not need to consider this argument. But the court on remand should con-

### 2. It was not an abuse of discretion to award Steven legal custody of Lolitta even though Steven is not Lolitta's biological father.

Kim contends that because Steven is not Lolitta's biological father—Steven adopted Lolitta shortly after he married Kim—it was an abuse of discretion to award Steven legal custody of Lolitta absent a showing that Kim is unfit, has abandoned Lolitta, or that Lolitta's welfare requires that Steven receive legal custody of Lolitta. Kim cites *Turner v. Pannick*, where we held that "[u]nless the superior court determines that a parent is unfit, has abandoned the child, or that the welfare of the child requires that a non-parent receive custody, the parent must be awarded custody." [30]

 Because AS 25.23.130(a)(2) provides that an adoption creates a relationship between the adoptive parent and child "as if the adopted person were a legitimate blood descendant of the [adoptive parent]," *Turner* is inapposite. It was therefore not an abuse of discretion to award Steven legal custody of Lolitta.

 We do not mean to imply, however, that the fact of an adoption may not be relevant to custody determinations. For example, AS 25.20.090(6)(A) provides that the court, "[i]n determining whether to award shared custody of a child ... shall consider ... the actual time spent with each parent." A biological parent potentially may have a longer relationship with the child than an adoptive parent. But the fact of adoption, in and of itself, does not disfavor the adoptive parent for purposes of determining the legal custody of an adopted child.

### 3. It was error not to make findings explaining the decision not to appoint a guardian ad litem.

Kim moved before trial to have a guardian ad litem appointed to represent the interests of the children. The superior court denied Kim's motion without making any findings on the record explaining its decision.

 Alaska Civil Rule 90.7(c) provides that "[i]f the court denies a motion for appointment of a guardian ad litem, the court must make findings to explain the denial." Similarly, AS 25.24.310 states: "Upon notification, the court shall determine whether the minor or other child should have legal representation or other services and shall make a finding on the record before trial." [31] We therefore conclude that it was error not to make findings on the record explaining the court's decision not to appoint a guardian ad litem. If the superior court concludes on remand that its reasons for denying Kim's motion have changed, the court may, but is not required to, revisit the issue.

### D. Property Division

### 1. Kim's Alaska Air National Guard pension

The superior court found that Steven was "entitled to a marital share of [Kim's] military pension" and that Steven's "marital interest in [the] pension [was] equal to 53 total months of service employment." Kim argues that the court erred (1) by basing the marital share of Kim's pension on the total period of coverture, and not just the duration of the marriage; and (2) by determining the marital share of Kim's pension based on the number of months of employment during coverture rather than the points earned during coverture. We address each argument in turn.

We disagree with Kim's assertion that because the parties married in October 1995 and separated in January 1999, the superior court should have based the marital share of her military pension on a maximum of thirty-nine months of employment, the duration of the marriage proper. In *Murray v. Murray*, we held that "the trial court is free to consid-

struct to the maximum extent possible a visitation schedule that conforms to the parties' availability; it should avoid scheduled weekend drill and annual training dates or adopt a default schedule for substitute visitation (for example, first weekend after a drill weekend conflict).

**30.** 540 P.2d 1051, 1055 (Alaska 1975).

**31.** *See also Howlett v. Howlett,* 890 P.2d 1125, 1127–28 (Alaska 1995) ("It is error for a trial judge to fail to make findings on the record explaining its decision concerning appointment of a guardian ad litem.") (citation omitted).

er the parties' entire relationship, including any period(s) of premarital cohabitation," in dividing the parties' property.[32] Thus, the basis for calculating the marital share is not necessarily limited to the period of the parties' marriage. It appears from the record that the parties began cohabiting in October 1994, fifty-one months before their eventual separation. If the superior court finds on remand that the parties indeed began cohabiting in October 1994, it should adjust the coverture period accordingly.

■■■ We agree with Kim's contention that the superior court should have determined the marital share of Kim's pension based on the number of points earned during the period of coverture rather than the number of months of employment during coverture. The marital share of a pension is typically determined by the coverture fraction, whose numerator is the number of months of employment during coverture, and whose denominator is the total number of months of employment at the time of vesting.[33] But where the value of retirement benefits is not directly related to the length of employment—such as when retirement benefits will be determined by the number of points earned as a result of the nature and frequency of the service rendered—the coverture fraction should be modified so that the numerator becomes the number of points earned during the period of coverture, and the denominator becomes the total number of points earned.[34] Because Kim's retirement is determined in part by the number of points she will have earned[35]—Kim earns one retirement point for each day of active

duty—it was error to determine the marital share of Kim's retirement simply based on the number of months of employment during coverture rather than the number of points earned during coverture.[36] We therefore remand for additional findings.

## 2. The Oregon Street duplex

■■■ The parties' 1997 post-nuptial agreement classified a duplex on Oregon Street as Kim's separate property. Thereafter, Kim and Steven jointly acquired debt which was secured by that property, and Kim concedes that Steven's name was added to the title. The superior court therefore classified the property as marital. Kim contends that it was an abuse of discretion to classify the property as marital, because, she argues, there was no intent to transmute the Oregon duplex from separate to marital property.

■■ "Parties to a divorce may stipulate to the characterization of property."[37] And absent a cognizable contract defense, such as fraud, stipulations should be enforced.[38] But Kim's counsel conceded at trial that the Oregon Street duplex should be classified as marital property. And when asked by the court: "Do you think anything that has been done or proposed does violence to [the] post-nuptial agreement," Kim's counsel responded "No." We therefore conclude that it was not an abuse of discretion to classify the Oregon Street duplex as marital property.

## 3. The superior court's valuation of the van was not clearly erroneous.

■■ Kim next argues that it was error to value the Toyota Sienna van the court award-

32. 788 P.2d 41, 42 (Alaska 1990).

33. *See Wainwright v. Wainwright*, 888 P.2d 762, 763 (Alaska 1995).

34. *See In re Marriage of Poppe*, 97 Cal.App.3d 1, 158 Cal.Rptr. 500, 504 (1979).

35. Kim was not employed full-time during most of her marriage to Steven. But Kim accrued points based on full-time service before she married Steven, and she claims that she "may eventually ... retire as a 'full timer.' " Because Kim accumulated points at a slower rate during her marriage to Steven than she did before she married him, the number of months of employment during coverture is not directly related to the number of points Kim earned during marriage,

and hence to the value of Kim's retirement benefit.

36. Thus, Steven's share of Kim's retirement benefit when she eventually retires and stops earning points will be $(x)(y)$(points earned during coverture/total points earned), where $\times$ is the percentage of Steven's marital share, and y is the total value of the benefit earned.

37. *Brown v. Brown*, 947 P.2d 307, 309 (Alaska 1997) (citing *Laing v. Laing*, 741 P.2d 649, 652 (Alaska 1987)).

38. *See id.*

ed her at $25,000, because the van is encumbered by a $20,000 debt. Kim cites *Mack v. Mack*, where we stated that "[g]enerally, the debt owed on any particular item of property will factor into the trial court's determination of the value of it."[39] But because the court allocated the van debt to Steven, we conclude that it was not clearly erroneous to value the van at $25,000.

#### 4. It was not error to fail to value Sail N Fun at the time of separation.

 Kim next argues that the superior court erroneously failed to value the parties' jointly owned business, Sail N Fun, at the time of separation. Kim admits that she did not seek such a valuation at trial. This argument was not preserved.[40]

### IV. CONCLUSION

Because it was error to disallow Kim a deduction for the depreciation of several rental properties, to include as gross income child support Kim receives for a child from a previous relationship, and to subtract the amount of that child support from her proposed deduction under Civil Rule 90.3(a)(1)(C), we VACATE the child support award and REMAND for recalculation of Kim's child support obligation. Because the child custody order was based on best interests findings that justified deviation from the parties' custody agreement, we AFFIRM the custody order. And because the value of the marital share of Kim's military retirement should have been based on the number of points earned during the period of coverture, we REMAND for additional findings regarding the military pension benefit.

**39.** 816 P.2d 197, 199 (Alaska 1991) (citation omitted).

**40.** *See Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985).