885 A.2d 907

Evelyn Saldana WOODSON

v.

Moses P. SALDANA, Jr.

No. 1150, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Nov. 3, 2005.

Cynthia E. Young (on the brief), Annapolis, for appellant.

Moses P. Saldana, Jr. (Pro Se on the brief), Mechanicsville, for appellee.

Panel: ADKINS, KRAUSER and JAMES S. GETTY, (Retired, Specially Assigned) JJ.

ADKINS, J.

Evelyn Saldana Woodson, appellant, challenges a judgment resolving disputed property issues in her divorce from appellee Capt. Moses P. Saldana, Jr., USMC (Ret.), as well as an order holding her in civil contempt and awarding attorney's fees. She raises six issues, which we have rephrased and reordered: [1]

I.  Did the trial court err in calculating the marital portion of Woodson's military reserve retirement benefits?

II. Did the trial court err in awarding *Crawford* credits to Saldana?

III. Did the trial court abuse its discretion in awarding Saldana a share of Woodson's civil service pension?

---

1. Woodson presents the issues as follows:
   I.   Were the contempt proceedings flawed in that appellant was deprived of procedural due process, and the court failed to find her behavior was either willful or contumacious?
   II.  Did appellee present sufficient evidence to enable the court to make an award of attorney's fees?
   III. Did the trial court properly calculate the award based on appellant Woodson's military reserve retirement benefits?
   IV.  Where appellee used marital funds to pay the mortgage and other expenses on the marital home, did the trial court abuse its discretion in awarding appellee "Crawford credits"?
   V.   Did the trial court err in failing to consider whether appellee dissipated marital funds when he expended marital funds to provide vacations for his girlfriends?
   VI.  Did the trial court abuse its discretion in awarding appellee a share of appellant's civil service pension which began to accrue only after the parties separated?

IV.  Did the trial court err in failing to determine whether Saldana dissipated marital funds to provide vacations for his girlfriends?

V.  Did the circuit court err in finding Woodson in contempt of a court order prohibiting her from entering and removing property from the marital residence?

VI.  Was the evidence sufficient to support the court's award of attorney's fees to Saldana in connection with the contempt proceedings?

We find merit in Woodson's first, second, third, and sixth assignments of error. In the divorce action, we shall vacate the order resolving disputed property issues and remand for reconsideration of the marital property issues arising from Woodson's military reserve retirement benefits, *Crawford* credits, and Woodson's civil service pension. We shall affirm the contempt finding, but vacate the attorney's fee award in the contempt order, and remand for further proceedings on that matter.

## FACTS AND LEGAL PROCEEDINGS

Woodson and Saldana were married on August 6, 1983, separated on June 20, 2001, and divorced on March 25, 2003. The couple has two children, Moses P. Saldana, III and Sara Saldana, both of whom were still minors at the time of the divorce.

Both Woodson and Saldana served in the military. Throughout the marriage, and until he retired effective October 31, 2004, Saldana was an active duty Marine Corps officer. Following active duty that ended in 1982 before the marriage, Woodson was on reserve military duty. After the separation, she became a civil service employee at the Pentagon.

The parties resolved custody, visitation, and some property issues consensually. During the litigation, the Circuit Court for St. Mary's County found Woodson in contempt of an order requiring her to stay away from Saldana's residence, which was the former marital home; the court ordered Woodson to

pay Saldana's attorney's fees in connection with that contempt order. After trial on the reserved property issues, the court issued a June 29, 2004 opinion and order. Woodson noted this timely appeal of both the property disposition and contempt orders. We will set forth additional facts as they pertain to our discussion of the issues.

## DISCUSSION

## I.

### Military Reserve Retirement Benefits

Woodson complains that the trial court did not correctly calculate the marital portion of her military reserve retirement benefits. During her military reserve career, Woodson accrued a total of 4,257 "points" toward retirement benefits. These retirement points may be awarded for a reservist's activities, and therefore do not necessarily accrue based solely on the length of active or reserve duty service. *See* 10 U.S.C.A. § 12731 *et seq.;* Marshal S. Willick, *Military Reserve Retirement Benefits in Divorce: A Lawyer's Guide to Valuation and Distribution* 43–45 (ABA Section on Family Law); *In re Marriage of Poppe*, 97 Cal.App.3d 1, 158 Cal.Rptr. 500, 502–03 (1979). Reservists must accrue at least 50 "retirement points" in a calendar year to have that year qualify toward retirement. *See* 10 U.S.C.A. § 12732(a)(2). In turn, reservists must accumulate 20 years of service, and must be at least 60, to be eligible for retirement pay.[2] *See* 10 U.S.C.A. § 12731(a). Points are earned not only for days of service, but also for performing certain drills, completing certain education courses, and maintaining membership in certain military units. *See* 10 U.S.C.A. § 12732 *et seq.*

In this respect, the retirement points accrual system for military reservists reflects more than merely time served. One commentator has observed, for example:

---

2. Because she is not yet 60, Woodson is not yet entitled to any military reserve retirement pay.

A point is awarded for each day of active service, or for full-time service while performing annual active duty training or attending required training. A point is awarded for each drill performed adequately, or for each three hours of military correspondence or extension courses that are successfully completed. Fifteen points are awarded for membership in the reserve components or the army or air force without component. There is an annual 60–point maximum for inactive-duty points, and a maximum of 365 points may be earned each year.

*Willick, supra,* at 44.

Because the court has jurisdiction over marital property that the parties have not divided by consensus, including retirement benefits earned during the marriage, it must calculate what portion, if any, of a military spouse's retirement benefits is marital. *See Bangs v. Bangs,* 59 Md.App. 350, 367–68, 475 A.2d 1214 (1984). After determining that Woodson was married 235 months and employed as a reservist for 198 of those months, the trial court determined Saldana's portion of her military retirement pay benefit using a "time formula" as follows: "½ (198/234) = 42.3%." [3] This "time formula"—*i.e.,* dividing the length of the marriage by the length of the pensioned employment—is standard in calculating the marital portion of pension and retirement benefits. *See Deering v. Deering,* 292 Md. 115, 129–30, 437 A.2d 883 (1981); *Hoffman v. Hoffman,* 93 Md.App. 704, 719, 614 A.2d 988 (1992); *Bangs,* 59 Md.App. at 367–68, 475 A.2d 1214. Using a time formula, the court found that Saldana "is entitled to 42.3% of [Woodson's] United States Marine Corps retirement pay."

Woodson argues that the court should have used the retirement points she earned during the marriage as the variable in the formula, rather than the months of reserve duty she served during the marriage. To illustrate the financial significance of using such retirement points to calculate the marital

---

**3.** The court did not explain why its formula used 234 months rather than the 235+ months the court determined was the length of the marriage.

portion of her military reserve retirement benefits, Woodson cites the following example from an American Bar Association, Section on Family Law treatise on valuing and distributing military retirement benefits in a divorce:

Major Bill Smith has five years of active duty and fifteen years of service in the U.S. Army Reserve. He married when he left active duty.

To compute the marital fraction according to points he acquired during active duty, we simply multiply five times 364 to get 1820 points. During his time in the reserves, he has acquired the maximum of 60 points a year (for weekend drill, "summer camp," and membership), and this equals 900 points over fifteen years. Thus his total points at twenty years are 2720, of which 900 (or about 33 percent) are marital. This means that 33 percent of his retirement pay (assuming retirement and date of separation both occur at year twenty) is marital. If his retired pay check at age sixty were $600, then the marital share would be $200.00 and his wife's presumptive one-half share would be $100 per month.

If we apply the marital fraction to his retirement pay using years instead of points, however, then with fifteen years of marital pension service and twenty total years of pension service, his pension is 15/20 (or 75 percent) marital. If his check were $600, then the marital portion would be $450 and the presumptive half to his wife would be $225 per month!

*Willick, supra,* at 46 n. 30.

Woodson argues that the trial court's use of a time formula resulted in a similarly inflated apportionment, increasing Saldana's share of her retirement pay by 6.2%,[4] as shown in the following chart:

---

[4]. Saldana contends that Woodson failed to preserve the retirement points issue by raising it below. *See* Md. Rule 8–131. We do not agree. At trial, Woodson asked for a zero award based on the same equitable considerations she raises in this Court. She argued that only active duty years of service should be considered. Moreover, Woodson re-

| | Months (per Bangs) | Points (for reservists) |
|---|---|---|
| Total earned | 235 months | 4257 retirement points |
| Earned during marriage | 198 months | 3098 retirement points |
| Formula used to calculate marital portion | 198 ÷ 234 = 84.6% | 3098 ÷ 4257 = 72.77% |
| Saldana's ½ share | 42.3% | 36.4% |

An interest in a military retirement pension is marital property to the extent it was earned during the marriage. *See Deering*, 292 Md. at 129–30, 437 A.2d 883. It is therefore subject to distribution under Md.Code (1984, 2004 Repl.Vol.), section 8–205 of the Family Law Article (FL).[5]

---

sponded to the court's ruling on this issue by moving for reconsideration on the ground that the court should have used a "units" method of calculation rather than using "the total months married" calculation. This was sufficient to preserve the issue for our review.

5. This statute provides, in pertinent part:

(a).... (2) The court may transfer ownership of an interest in ... a pension, retirement, profit sharing, or deferred compensation plan, from one party to either or both parties....

(b) The court shall determine ... the terms of the transfer of the interest in property described in subsection (a)(2) of this section, or both, after considering each of the following factors:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in property described in subsection (a)(2) of this section, was acquired, including the effort expended by each party in accumulating the marital property or the interest in property described in subsection (a)(2) of this section, or both;

(9) the contribution by either party of property described in § 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in property described in subsection (a)(2) of this section, or both.

██ "[T]he court has broad discretion in evaluating pensions and retirement benefits, and in determining the manner in which those benefits are to be distributed." *Welsh v. Welsh*, 135 Md.App. 29, 54, 761 A.2d 949 (2000), *cert. denied,* 363 Md. 207, 768 A.2d 55 (2001). Nevertheless, in doing so, the court must consider the statutory factors enumerated in section 8–205(b). *See Collins v. Collins,* 144 Md.App. 395, 409, 798 A.2d 1155 (2002). "While consideration of the factors is mandatory, the trial court need not 'go through a detailed check list of the statutory factors, specifically referring to each, however beneficial such a procedure might be ... for purposes of appellate review.' " *Doser v. Doser,* 106 Md.App. 329, 351, 664 A.2d 453 (1995)(quoting *Grant v. Zich,* 53 Md. App. 610, 618, 456 A.2d 75 (1983))(other citation omitted).

██ In this instance, however, we are lacking more than a "detailed check list of the statutory factors." Despite the court's statement at the outset of its opinion that "[a] detailed description of the court's reasoning on the status and value of [this] property follows," there simply is nothing in that opinion or the corresponding order to indicate that the trial court considered the statutory factors. Neither document refers to any of the factors in connection with the distribution of retirement benefits—or, for that matter, any other marital property. Indeed, we do not even find a citation to FL section 8–205(b) in the court's discussion of either applicable law or factual issues.

This silence, when viewed in conjunction with the court's statements that Saldana "is entitled to" half of the marital portion of Woodson's retirement benefits, creates an intolerable possibility that the statutory factors were not considered because the court believed that it was **required** to make such an award. For that reason, we shall vacate the monetary award and remand for reconsideration of this and all other financial issues upon which the court premised that award. In

Md.Code (1984, 2004 Repl.Vol.), section 8–205 of the Family Law Article (FL).

doing so, we are aware that the "points v. time" issue raised by Woodson in her motion for reconsideration and this appeal will recur. Accordingly, we shall address that question for guidance purposes.

■ In determining what portion of Woodson's military reserve retirement benefit is marital property, the court must consider all relevant evidence, including, we think, evidence presented by Woodson that her retirement benefits are premised on retirement points that accrue on the basis of factors other than the length of her military reserve service.[6] Maryland appellate courts have not addressed whether the marital portion of retirement benefits earned by military reservists should be calculated on the basis of time rather than points. Other courts and commentators that have specifically considered this question have concluded that the marital portion of such benefits must be based on retirement points. *See, e.g., Faulkner v. Goldfuss,* 46 P.3d 993, 1003 (Alaska 2002)("where the value of retirement benefits is not directly related to the length of employment—such as when retirement benefits will be determined by the number of points earned as a result of the nature and frequency of the service rendered—the coverture fraction should be modified so that the numerator becomes the number of points earned during the period of coverture, and the denominator becomes the total number of points earned"); *Bloomer v. Bloomer,* 927 S.W.2d 118, 121 (Tex.Ct.App.1996)("trial court should have characterized [reservist's] military retirement benefits by comparing his points accrued while married to the total accrued points"); *In re Marriage of Beckman,* 800 P.2d 1376, 1379–80 (Colo.Ct.App. 1990)(" 'Use of a simple years of service computation rather than recognition of the point system will, in some situations lead to inequitable conclusions. The greatest potential for

---

**6.** A single page in the record extract, which appears to summarize Woodson's reserve retirement account, indicates that Woodson may have earned points for membership in certain military units. *See generally* 10 U.S.C.A. § 12732(a)(authorizing award of retirement points for specified reserve duty service, including drills, courses, and memberships).

distortion of the marital share of the benefit occurs in situations, where the member of the military retirement system switches from regular component to reserve component service' ")(quoting W. Troyan, "Procedures for Evaluating Retirement Entitlements Under Non–ERISA, Retirement Systems for Marriage Dissolution Actions," *in* 3 J.P. McCahey, ed., *Valuation & Distribution of Marital Property* § 46.34(1)(1990)); *Poppe,* 158 Cal.Rptr. at 503–04 ("the basis upon which apportionment was made, years of service during the marriage before separation compared to 'qualifying' years in service, bears no substantial rational relationship to the amount of the pension" because the amount of reservist's retirement benefit was a function of the total points earned for various activities, rather than simply his length of service).

We agree that, when a reservist's retirement pay is not strictly a function of the length of military service, the appropriate formula is retirement points earned during the marriage divided by the total retirement points earned. The fractional equation used to determine the marital portion of military reserve retirement pay must use the same unit of measurement in both the numerator and the denominator. Because military reserve retirement pay is earned on the basis of points rather than time, both variables in the formula used to apportion that pay logically should also be points. *See Poppe,* 158 Cal.Rptr. at 503–04.

On remand, the circuit court must consider the evidence that Woodson earned retirement points for activities other than days of military service. If Woodson did, as it appears from the limited record presented to us, the court must determine the marital portion of her retirement benefit by dividing the points she earned during the marriage by the total number of points she earned.

## II.

### *Crawford* Credits

The trial court awarded Saldana $15,756.18 in *Crawford*

credits [7] for his payments of the mortgage, homeowner's association dues, and home improvements on the marital home, from July 1, 2001 through sale of the residence on April 28, 2003. Woodson argues that the trial court erred in doing so "without consideration of equitable factors." Specifically, she argues that the evidence showed that Saldana used marital funds to pay the mortgage and other expenses on the marital home. Comparing this case to *Broseus v. Broseus,* 82 Md. App. 183, 570 A.2d 874 (1990), in which this Court approved the denial of *Crawford* credits to the payor spouse on the ground that his payments had been made from marital funds, Woodson asserts that "Saldana did not personally make the mortgage payments" on the marital home during the separation. Instead, such "payments and related expenses were made by the U.S. Government by means of a Basic Housing Allowance which Saldana received only because he was married and did not reside in military housing." In addition, Saldana enjoyed the unaccounted-for benefit of living in the house and claiming the tax deduction.

Saldana asks us to affirm the award of *Crawford* credits because "the fact that money came from a housing allowance rather than a salary does not change the fact that it was compensation for services rendered that was, in turn, used to pay the mortgage, taxes, insurance, etc." Moreover, after the December 2, 2002 consent order granting child custody to Woodson, his housing allowance rate was reduced to "Single without Dependents."

For the same reasons we discussed in Part I with respect to military retirement benefits, we also are persuaded by Woodson's contention that the court did not consider equitable factors in awarding Saldana *Crawford* credits. The order states:

---

7. *See Crawford v. Crawford,* 293 Md. 307, 443 A.2d 599 (1982)(presumption of gift doctrine between married co-tenants does not apply to mortgage, tax, and other payments made to preserve marital home, when made by one spouse following separation; accordingly, that payor spouse may receive "contribution credits" when court determines monetary award).

The spouse who, following separation, pays mortgage and other carrying charges that preserve the [marital] property **is entitled to** contribution credits prior to any division of proceeds from the sale of that property, even in the absence of an explicit agreement to this effect. Therefore, [Saldana] is entitled to credit for ... expenses he incurred in maintaining the house between the date of the parties' separation and divorce[.] (Emphasis added.)

An award of *Crawford* credits, however, is discretionary, so that it cannot be said that "the spouse who pays mortgage and other carrying charges that preserve the property is entitled to" receive such credits in all cases. *See Keys v. Keys,* 93 Md.App. 677, 681, 614 A.2d 975 (1992); *see also Kline v. Kline,* 85 Md.App. 28, 48–49, 581 A.2d 1300 (1990), ("the reason contribution is not mandatory between spouses at the time of divorce is that contribution is an equitable principle ... and the ability to grant a monetary award under the [Marital Property] Act enables the chancellor to achieve more complete equity than can be done through a *Crawford* contribution"), *cert. denied,* 322 Md. 240, 587 A.2d 246 (1991). Instead, the court must exercise its discretion to determine whether *Crawford* credits are warranted.

Here, the opinion and order are both phrased in the "entitlement" terms. The trial court's conclusion that Saldana "is entitled to [*Crawford* ] credit," in light of its failure to discuss any of the specific equitable factors argued by Woodson, indicates that the court may have incorrectly believed that it was obligated to make such an award to Saldana. On remand, the court must determine whether and to what extent *Crawford* credits are warranted, in a manner that permits appellate review.

## III.

### Civil Service Pension

In October 2001, following her separation from Saldana, Woodson became employed in a federal job that qualifies for civil service pension benefits. She continued in that position

through the date of divorce, accruing a total of 17 months of civil service during the marriage. The trial court awarded Saldana one half of that marital property on an "if, as, and when basis," because Woodson's total number of months of civil service is unknown. *See Pleasant v. Pleasant,* 97 Md. App. 711, 632 A.2d 202 (1993); *Hoffman v. Hoffman,* 93 Md.App. 704, 719, 614 A.2d 988 (1992); *Bangs v. Bangs,* 59 Md.App. 350, 475 A.2d 1214 (1984).

Woodson challenges that order, arguing that the trial court abused its discretion in awarding Saldana half of the civil service pension that she earned as a result of her return to work after the separation. In her view, the court failed to give the heavy weight due under FL section 8–205(b)(8) to

**[h]ow and when** specific marital property or interest in pension, retirement, profit sharing or deferred compensation plan was acquired, including the effort expended by each party in accumulating the marital property or the interest.... (Emphasis added.)

In *Alston v. Alston,* 331 Md. 496, 507, 629 A.2d 70 (1993), the Court of Appeals held that the trial court erred in failing to give this factor "considerable weight" in distributing the value of a lotto ticket that the husband purchased after separation:

Where one party, wholly through his or her own efforts, and without any direct or indirect contribution by the other, acquires a specific item of marital property after the parties have separated and after the marital family has, as a practical matter, ceased to exist, a monetary award representing an equal division of that particular property would not ordinarily be consonant with the history and purpose of the statute.

*Cf. Skrabak v. Skrabak,* 108 Md.App. 633, 655, 673 A.2d 732 (trial court gave appropriately heavy weight to how and when husband acquired pension plan for medical practice established after separation), *cert. denied,* 342 Md. 584, 678 A.2d 1048 (1996).

Woodson contends that both the "how" and "when" factors weigh 100 percent in her favor because she earned the civil service pension benefits through her post-separation employment. In her view, the court's failure to consider that undisputed fact constitutes a failure to exercise discretion, which "is, itself, an abuse of discretion." *See G.E. Capital Mortgage Servs., Inc. v. Edwards,* 144 Md.App. 449, 455, 798 A.2d 1187 (2002).

Saldana asks us to reject Woodson's argument "because the trial court did indeed exercise appropriate discretion in using a multiplier of one-half in its *Bangs/Pleasant* calculation." Noting that "the same court granted her a one-half share in [his] pension," Saldana distinguishes this case from the lottery tickets and corporate assets acquired in *Alston* and *Skrabak*.

As we concluded above, we are unable to say that the trial court considered any of the section 8–205(b) factors in its decision, including the eighth "how and when" factor. On remand, the court should explain its decision in a manner that indicates the exercise of such discretion.

## IV.

### Alleged Dissipation

"Dissipation may be found where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown." *Sharp v. Sharp,* 58 Md.App. 386, 401, 473 A.2d 499, *cert. denied,* 300 Md. 795, 481 A.2d 240 (1984). Woodson requested reimbursement for Saldana's expenses in taking trips to San Antonio, Austin, and Jamaica with two different women, during the marriage. She contends that the trial court erred in failing to determine whether Saldana dissipated these marital funds by using them to pay for the vacations during the time the marriage was breaking down. At trial, she sought reimbursement for $2,283.13 in such expenses, although she admits that "the word dissipation' was not used" in her trial memorandum, so that "perhaps understandably," the trial court responded, with

respect to Saldana's "trips," that "[e]xpenses associated with travel . . . are not property."

We agree with Saldana that Woodson waived any dissipation claim she may have had by failing to assert it in the trial court. The burden of persuading the trial court that there was dissipation of marital assets is on the party alleging dissipation. *See Solomon v. Solomon,* 383 Md. 176, 202, 857 A.2d 1109 (2004). Having failed to articulate her dissipation theory in connection with these particular expenses, Woodson cannot now complain that the trial court failed to address it.

## V.

### Contempt Order

During the time the divorce action was pending between December 2001 through May 29, 2003, Saldana moved for six contempt orders against Woodson. Most of the motions related to visitation issues. The fourth motion, however, concerned Woodson's alleged entry into Saldana's residence in violation of a March 5, 2003 protective order "that the parties shall not enter the residence of each other."

Saldana, who resided in the former marital home, alleged that on April 6, 2003, as well as "on at least four prior occasions since . . . June 30, 2001, [Woodson] broke into Saldana's home." According to Saldana, on the 6th, a number of items disappeared while he was away from the home. Neighbors saw Woodson and her friend David Woodson "removing personal property from the home . . . and loading it into David Woodson's truck." They removed items included items from the inside of the house and from the garage.

A May 29, 2003 hearing was held on all contempt motions. Saldana called Woodson as a witness. She admitted going to the home on April 6, but claimed that she unsuccessfully tried to notify Saldana between March 31 and April 6 that she planned to do so. Woodson testified that, while at the home, she and her fiance' David Woodson removed various items of personal property from the garage, making two trips "to get

in there and get back out[.]" When asked why she had done so, Woodson replied:

> [Woodson]: Because on previous occasions, Moses had cleaned out the house. I don't have anything. And we sold the house a couple of days after the twenty fifth Order . . . . don't have any keys to the house so [the realtor's] been in the house for the selling of the house so she informed me that I needed to get whatever little thing was left in the house. So . . . I had my remote to the garage and I went in the garage and I got whatever was left in the garage which was my kids' toys that I've saved for sixteen years for memorabilia, Little Tyke toys. Whatever I can get, ma'am, because everything's gone in the house. So there's no need for me to go in the house and that's what I took. . . .
>
> [Saldana's Counsel]: So you're blaming your realt[or] for breaking Her Honor's Order? You're saying the realtor told you to go back?
>
> [Woodson]: No. . . . What I was doing is protecting what little property was left of my children. It wasn't even mine. It belonged to my children. . . .
>
> [Saldana's Counsel]: And you're saying two pick up truck loads was all your children's items? None of it was . . . marital property, just the children's?
>
> [Woodson]: That's correct.

On cross-examination by her own counsel, Woodson insisted that she did not enter the house and that she did not take anything that belonged to either Saldana or herself. She explained, however, that she did take a push mower "[t]o sweep my . . . residence where I live now" [sic], as well as curtain rods and a folding card table set.

Saldana also testified at the contempt hearing. He claimed that property was missing from both the garage and inside the house. Among the items taken out of the house was a card table he was using as a dining room table; "pictures from the wall;" and the shower curtain, rod, and hooks from Sara's bathroom. Saldana also recounted, in support of his sixth

motion for contempt, that on April 26, Woodson came to his house and took the family dog.

After Saldana rested his case, the court addressed counsel for Woodson: "[D]o you have anyone besides Mrs. Saldana? Okay. Would anybody think it's a good idea for me to talk to the children at this point and then we can continue with that?" Following a discussion regarding the format of that conversation, the court heard from the two Saldana children and their counsel *in camera.*

Returning to the bench, the court noted that "we're not finished with the case yet so—we're going to have to reschedule it to come back, but I don't want to leave everything just hanging wide open[.]" The court proceeded to address the children and their counsel regarding visitation issues. When the children left the courtroom, the court addressed the parties and counsel:

[The Court]: ... I've got two aspects of this case right now and it's not over. Like I said, we're not finished. We going to come back and, Ms. [Woodson], you've testified some but certainly not as much as you're going to and as much as you're entitled to.

Now talk for a moment about you're going to the house. There's no question you violated the Court Order. You ... could have had all the reasons in the world, but you ... were not supposed to go in there and if you wanted to go there and you didn't talk to Mr. Saldana about it, then ... you needed to get something filed and you needed to get something worked out between the attorneys.

You were ordered not to go there and you went anyway. I understand there's some major problems between the two of you but you simply disobeyed the Court Order and .... whether I find you in contempt or not, because I'm not going to do that right this minute because we still need to do more on this visitation issue, but you violated the Court Order and the Court Order says you're going to pay attorney's fees if you violate the Court Order.... [I]t's Exhibit One in which the attorney's time was spent dealing with the

. . . issue of—part of it was visitation . . . but most of it had to do with the property and it had to do with having to file something twice because you violated the Court Order by going to the house and taking things. Doesn't matter whether some of those things were for the kids or whatever the reason might be. It was clearly a violation of the Court's Order.

So I'm going to order that you . . . reimburse Mr. Saldana nine hundred and forty five dollars and twenty five cents for his attorney's fees for having to bring this action for you disobeying that Court Order. . . .

Stating that it was "reserv[ing] on the issue of whether you're in contempt concerning the visitation[,]" the judge asked whether "there is anything else that I need to do right now[.]" Saldana's counsel then offered to submit "an Order on those fees that you just ordered[.]" The court replied, "Sure, that'd be fine[,]" then solicited any comments from Woodson's counsel, whose only reply related to "put[ting] in a clause . . . that says the parties can communicate . . . . with each other" regarding the children.

## A.

## Due Process

Woodson argues that "the trial court failed to give [her] the opportunity to put on her defense before announcing that she was in contempt as alleged in the Fourth Petition." Emphasizing that she was "called as an adverse witness[,]" Woodson contends that the court prematurely found her in contempt shortly after it noted that the contempt proceedings were not complete and would have to be rescheduled. "This abrupt termination and finding . . . denied Woodson her right to procedural due process under the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights."

Saldana counters that Woodson had a full and fair opportunity to testify in response to questions by both his counsel and her own counsel, as well as an opportunity to present any defense she might have had to the home entry contempt

allegations. The trial court heard her disclaimers and simply rejected them.

We agree with Saldana that Woodson does not have a viable due process claim in these circumstances. Her counsel did not object to the entry of a contempt order on the ground that she had additional evidence relevant to the home entry motion, even after the court invited counsels' comments on the proposed order. Notwithstanding any ambiguity in the court's remarks about future testimony and proceedings, this silence reflects Woodson's tacit agreement that she had no further defense to the home entry motion. Moreover, the record shows that Woodson unequivocally admitted violating the court order by going to Saldana's residence. Thus, Woodson did not assert any defense that could have been corroborated by another witness. For these reasons, we conclude that Woodson was not denied an opportunity to present her defense to the home entry contempt motion.

## B.

### Wilfulness

Woodson alternatively argues that the contempt ruling "lacked the requisite finding of willfulness." We again disagree. It is not necessary for the court to use this "magic word" to make such a finding. Both the testimony given by Woodson and the court's ruling made clear that Woodson's entry of the home was the result of a deliberate decision to remove items from the property, which plainly qualifies as "willful" disobedience of the stay away order, as that term is defined for contempt purposes. *See, e.g., Dodson v. Dodson*, 380 Md. 438, 452–53, 845 A.2d 1194 (2004)(recognizing that essence of contempt is refusal to comply with court order).

## VI.

### Attorney's Fees For Contempt Proceedings

At the hearing on Saldana's contempt motions, Saldana's counsel introduced into evidence a bill for $944.25 in

attorney's fees "incurred for the fifth motion for contempt[.]"[8] The fees awarded by the court matched that amount.

Woodson complains that Saldana's fee bill did not provide an evidentiary basis for the award and that the court failed to make a finding regarding the reasonableness of such fees. Citing *Rauch v. McCall,* 134 Md.App. 624, 639, 761 A.2d 76 (2000), *cert. denied,* 362 Md. 625, 766 A.2d 148 (2001), she argues that fee awards are "not justified by a mere compilation of the hours multiplied by the fixed hourly rate of the bill." Moreover, she points out, the fee bill prepared in connection with the fifth motion for contempt related to work on the visitation issues relevant to that motion, whereas the order for contempt was premised solely on the separate home entry issue raised in the fourth motion for contempt.

Saldana agrees that the fee award is premised on a different contempt motion than the one upon which the contempt order is premised. Instead, he argues that the fee award "is fully justified" given the court's discretion in such matters and the considerable work done to prepare the motion, appear in court, and present witnesses and documentary evidence.

We agree with Woodson that the court erred in using a fee bill relating to the fifth contempt motion as the basis for a fee award relating to the separate issue raised and adjudicated in the fourth contempt motion. The bill considered by the court states that it relates to charges in connection with visitation issues and drafting the fifth motion for contempt. There was no bill, testimony, or other evidence regarding the fees and expenses with respect to the earlier home entry motion.

We cannot accept Saldana's invitation to disregard this error due to the "small amount" of the award or the nature of work for which compensation would be appropriate. The court should have considered evidence regarding only the work performed and expenses incurred on the home entry motion. There is no such evidence in the record. Appellate

8. In addition, Saldana introduced bills for the sixth contempt motion and a subsequently filed seventh contempt motion.

courts do not speculate that a trial court would have awarded the same or a greater amount if it had considered different evidence. Consequently, we vacate the fee award in the contempt order and remand for the circuit court to determine the appropriate amount in connection with that motion.

### Conclusion

We shall vacate the property disposition order in the divorce action and remand for reconsideration of the marital portion of Woodson's military reserve retirement pension, *Crawford* credits, and the civil service pension issues. In doing so, we express no opinion as to the specific outcome of these issues, or the appropriate amount of any monetary award. In addition, we shall vacate the attorney's fee award in the contempt order and remand for redetermination of that matter.

**PROPERTY DISPOSITION ORDER FILED JUNE 29, 2004 VACATED. ATTORNEY'S FEE AWARD IN CONTEMPT ORDER FILED JUNE 4, 2004 VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ⅓ BY APPELLANT, ⅔ BY APPELLEE.**